### Caroline PONTICELLI, Plaintiff,

v.

**ZURICH AMERICAN INSURANCE GROUP, Zurich American Insurance Company, Evan Callas, Charles Herbert and Robert Fishman, individually and in their capacities as officers of Zurich Insurance Company, Defendants.**

No. 96 Civ. 9095 (RWS).

United States District Court, S.D. New York.

Sept. 3, 1998.

Mary D. Dorman, New York City, for Plaintiff.

Vedder, Price, Kaufman, Kammholz & Day, New York City (Alan M. Koral, Neil A. Capobianco, of counsel), for Defendants.

## OPINION

SWEET, District Judge.

In this action alleging discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York State Human Rights Law, N.Y. Exec. Law § 296 (the "HRL"), defendants Zurich Insurance Company ("Zurich")—sued as "Zurich American Insurance Group" and "Zurich American Insurance Company"—Evan Callas ("Callas"), Charles Herbert ("Herbert"), and Robert Fishman ("Fishman") (collectively, the "Defendants") have moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P. Additionally, plaintiff Caroline Ponticelli ("Ponticelli") has cross-moved for partial summary judgment.

For the reasons set forth below, Defendants' motion will be granted in part and denied in part, and Ponticelli's cross-motion will be denied. Specifically, Defendants' motion for summary judgment will be granted as to Ponticelli's 42 U.S.C. § 1983 claim, the gender-based discrimination claim (to the extent it is alleged), her retaliation claim, and the claim for intentional infliction of emotional distress, and the motion will be denied as to the hostile work environment claim. The claims against Callas, Herbert, and Fishman (collectively, "the individual defendants") under Title VII will be dismissed. The claims against the individual defendants under the HRL will be dismissed without prejudice.

### Parties

Ponticelli is a resident of Kings County, New York. She was hired by Zurich on April 10, 1995, in the capacity of underwriting assistant in its offices at One Liberty Plaza, New York.

Zurich maintains an office at One Liberty Plaza in the city, county, and state of New York and is licensed to do business in New York State.

Evan Callas was, at the time relevant to this action, Assistant Vice President of Zurich.

Herbert was, at the time relevant to this action, Vice President of Human Resources and the person designated by Zurich to receive and investigate claims of sexual harassment.

Fishman was, at the time relevant to this action, Senior Vice President of Zurich, in charge of the Professional Liability Department.

### Prior Proceedings

Ponticelli filed the complaint (the "Complaint") in this action on December 3, 1996.

The Complaint alleges (1) that Ponticelli has been denied her rights under the Fifth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983; (2) that she has been denied equal terms and conditions of employment and equal employment opportunity on the basis of sex in violation of Title VII; (3) that Defendants violated the HRL § 296(1)(a) by constructively discharging and otherwise discriminating against her because of her gender; (4) that Defendants violated the HRL § 296(7) by discharging and otherwise retaliating against Ponticelli because of her opposition to the unlawful employment practices of Zurich; and (5) that Defendants willfully and maliciously inflicted mental and emotional distress upon her.

Defendants made the instant motion for summary judgment on March 17, 1998. Ponticelli filed her cross-motion for partial summary judgment on May 18, 1998. Oral argument was heard on June 3, 1998, at which time the motions were deemed fully submitted.

### The Facts

The alleged discrimination underlying this action occurred in a series of incidents, the facts of which are in substantial dispute. All material allegations relating to Ponticelli's claims are gleaned from the Complaint and the deposition of Ponticelli, as well as testimony by Fishman and Herbert.

### I. Ponticelli's Job Duties and Work Conditions

From April 10, 1995, to March 19, 1996, Ponticelli was employed by Zurich. She was hired as a technical assistant in Zurich's Professional Liability Department. The head of the department was Fishman. Reporting to Fishman was Callas, an Assistant Vice President for miscellaneous professional liability lines. Ponticelli reported to Callas, who was responsible for directing and overseeing her work. Ponticelli was responsible for logging in submissions, reviewing claims on discontinued policies, and training other technical assistants. According to Ponticelli, she did "everything." As she was not an underwriter, however, she did not have the authority to renew policies. Rather, after logging in a submission—i.e., an application for insurance—it was her responsibility to find out who should review it. Ponticelli testified in deposition that there were many times when no one would accept the policy, so even though she was not an underwriter, she would make the decision whether to issue or decline it on her own.

On her first day of work at Zurich, Ponticelli was assigned to the cubicle of her predecessor. The desk drawers and outside of the desk were piled high with unfinished paperwork. Letters of complaint and telephone complaints from brokers were received by her and referred to her. Ponticelli found stale premium checks left in her desk drawer by her predecessor. Ponticelli found herself "running very fast," in a relatively new professional liability unit which was in a "start-up" mode. It was understaffed with a concealed backlog. Although Ponticelli was without training, she applied herself to Fishman's expectations of doing "lots of different things" and being "able to solve issues and problems."

From the beginning Ponticelli worked between 50 to 70 hours a week. She did not take a lunch hour because she had too much work to do, and she worked weekends. Callas never told her to stay late, but Ponticelli felt that she had to put in late hours to complete her work. Ponticelli told Herbert that she was not eating lunch, and he told her to take a lunch break. According to Ponticelli, none of the male managers in her unit did much work. Instead, they sat in Callas's office and fooled around for about 90% of every day and went out and drank alcohol at noon.

Callas reprimanded Ponticelli about her inadequate work performance, about work not being done on time, and about work not being completed properly. Ponticelli asserts that Callas would call her into his office, yell at her for getting him into trouble and for betraying him, and tell her she had a big mouth. When Ponticelli advised Fishman of Callas's yelling, he told her that Callas scared him in the same way and that it was hard to deal with him because of his threatening and violent behavioral tendencies.

Ponticelli brought to Fishman's attention the extent of the policy issuance backlog that had developed under her predecessor. In response, Fishman assigned a male underwriting assistant from another department to help Ponticelli.

Sometime late in the summer of 1995, Ponticelli was diagnosed with carpal tunnel syndrome. Although Ponticelli claims she reported her diagnosis to individuals at work, she never provided anyone at Zurich with a doctor's note.

Ponticelli maintained a contemporaneous diary of incidents at work. In it, under the date of September 5, 1995, Ponticelli recorded that Callas called her into his office, closed the door, and told her that she was not performing adequately and in a reasonable time frame. He also told her that she put in too much overtime. Callas told her not to assist others, not to speak with anyone, or to make small talk. According to Ponticelli, Callas called her "stupid" and "foolish" for talking to other technical assistants. When she explained that Fishman had asked her to train them, Callas reminded her that she worked for him and not for Fishman. Ponticelli admits that her job performance was suffering. She insists it was because she had to help other people and do work for everyone in the department. Supervisors were coming to her with work, and she felt that she could not say no to them even though most of the groups in the professional liability department had their own technical support personnel.

The record indicates that Fishman received numerous complaints about Ponticelli's work. As Ponticelli's replacement, Donna Sylvester, had no problem accomplishing the given tasks, Callas concluded that Ponticelli performed "quite poorly" since she made the same mistakes repeatedly, had trouble prioritizing her work, and failed to pay attention to her given tasks.

## II. *Ponticelli's Sexual Harassment Allegations*

It is not altogether clear whose improper conduct Ponticelli wishes to impute to Zurich. Ponticelli claims generally that she was subjected to sexual harassment by Callas, Noel Jamison ("Jamison"), a Senior Underwriter for whom she also performed work, and Herbert. Ponticelli states that Callas made repeated comments about her body, clothes, hair, and fingernails, made sexual advances towards her, laughed at her, and made fun of her. Indeed, Ponticelli testified that almost everything that Callas said or did was a sexual advance. Ponticelli also thought that Jamison wanted to have a sexual relationship with her, although he never invited Ponticelli to have sex with him. Ponticelli also observed various men at Zurich looking at and commenting about other women in the office.

On May 15, 1995, Ponticelli went out to lunch with Callas and Jamison. She was uncomfortable, she claims, because they wanted to discuss the physical appearance of a female attorney Ponticelli knew from her previous employment at St. Paul Reinsurance Company. When Callas asked Ponticelli how she met her husband, Ponticelli felt that he was implying that she had slept with her husband to get a job. When Ponticelli asked Callas if that was what he was asking, he rolled his eyes and made smacking noises with his lips, which Ponticelli described as locker room noises. In addition, Ponticelli felt as if they were "coming on to her" and flirting because they were talking about women in terms of sexuality. Two weeks later, Ponticelli asked Callas about a policy form, and he replied that "we use a broad form, like you." Ponticelli thought this was flirtatious.

Callas never asked Ponticelli out directly. He asked her to go to lunch a few times and told her she was welcome at his home in New Jersey, which he shared with his wife and four children. Ponticelli asserts that she had one business lunch and two personal lunches with Callas during her employment at Zurich. At one of the personal lunches, Callas questioned her about former boyfriends. At another, he asked her why she did not have any children.

On June 29, 1995, one of the underwriters organized an after-work social event at the Tall Ships Restaurant at the World Trade Center. Throughout the evening, Ponticelli testified that Callas and Jamison were star-

ing at the women's chests. She states that they made indirect comments about her chest but does not remember what exactly they said. At one point, according to Ponticelli's diary, she saw Callas and Jamison grab another female employee by her arms, shoulders, and jacket sleeves. The employee looked at Ponticelli and said to Jamison, "You're scaring me." Callas and Jamison asked the woman how much she weighed and made other comments while staring at her chest and Ponticelli's chest. At that point, while Ponticelli attempted to walk away, Callas blocked her and asked where she was going. He was drunk and boasted to Ponticelli that he had put someone in the hospital once, that he was sensitive, and that he had a bad temper.

Anxious to get away from Callas, she called her husband who was on his way to have dinner with clients nearby. He asked Ponticelli to wait so they could travel home together. She returned to the party and went out to eat with seven or eight women from the office and Callas. After dinner, according to Ponticelli, Callas suggested that he take her to her home in Brooklyn via the company car service. Because he was her supervisor, Ponticelli felt compelled to go with him. Callas asked her if there was any crime in her neighborhood and offered to see Ponticelli upstairs to her apartment. She said no. According to Ponticelli, Callas then became hostile and unpleasant. She did not report anything about the evening to anyone at Zurich.

Ponticelli testified that Jamison looked at her chest, looked her up and down, and told her that she dressed well. He also said that his wife would not mind if he had affairs as long as he did not tell her about them. She had dinner with Jamison several times. He asked her questions about her personal life and questions of a sexual nature. Jamison sometimes commented that she seemed to be in a bad mood or "on the rag" or uptight, and told her that she needed to "get laid." At one dinner, Jamison asked Ponticelli about her relationship with her husband and told her about his relationship with his wife. He told her that he was bored sexually and did not believe that marriage had to be a mono-

gamous relationship. At another dinner, which was primarily about business, they discussed the possibility of Ponticelli resigning from Zurich.

As for Callas, Ponticelli claims that he called her a slut and a stupid, air head, miserable childless person. He also told her that she had working horse hands and made comments about her stockings, clothes, and makeup. He implied that her lipstick was the color of a nipple. Ponticelli recalls that Callas called her a "f____ing bitch," told her he did not have to "put up with this sh__," and said "f___ you" on a number of occasions. He interrupted her and yelled at her in front of others and repeated what she said in a mocking way. He called her the "big hurt." According to Ponticelli, Callas cursed or insulted her in this manner more than once, but she cannot remember if it happened more than five times.

Callas said that he could see her nipples through her blouse. Callas called her breasts "jugs" and "hooters." Callas walked down the hall close behind Ponticelli and said something about the way she wiggled. Callas stated that her "rear end" was big, that it shook when she walked, and that he butted her behind in where it did not belong. She never told anyone at Zurich about any of these comments.

Callas would also tell Ponticelli if he thought she looked nice or if he did not like her suit. He told her when her stockings wrinkled at her ankles. On occasion, he told her that her clothes were too tight, and once he asked her why she did not wear shorter skirts. He also asked where she got her jewelry. While Ponticelli mentioned these remarks to some of the other technical assistants, she never mentioned them to anyone else at Zurich.

Callas told Ponticelli he liked her legs and the way she walked. He also asked her why she sat with her legs crossed. She does not recall whether she complained to anyone regarding these comments.

In September 1995, Ponticelli was seated at her desk in her cubicle at 5:30 in the afternoon. A small object sailed by her head, narrowly missing her. It was a rubber

stamp thrown by Callas who had borrowed it from Ponticelli earlier in the day. She turned her head to see Callas crouched down in front of her, blocking the doorway. He leaned his left arm on one of the arms of Ponticelli's chair, and in his right hand he held a draft of a document that she had left for him to review. He asked her, "What is this sh__?" Ponticelli said she would fix it, and Callas responded "fix this" while grabbing his crotch. She asked Callas what she had done wrong, and he said that she was a stupid idiot and a slut. Callas was close enough that she could smell alcohol on his breath. She ducked under his arm and ran out of the cubicle.

According to Ponticelli, Callas's treatment of Ponticelli became worse once it became clear to him that Ponticelli was not going to succumb to alleged pressure for a sexual relationship. She contends that he would threaten her job by telling her that her review was coming up and that she was not going to do well on it. In fact, no review was given. Defendants claim that the threatening of her job was because of her poor work performance.

After Ponticelli was transferred to another department (discussed below), she told Callas that she did not want to continue to work with him. He said, "I'd rather talk about you." He proceeded to ask her the color of her pubic hair and if she had ever had anal sex. "He said something about the doggy position, he asked me if I had ever done that position, and he said something about that he had never gotten to know me, and he asked me what bra size I wore and what my clothing size was." (Ponticelli Dep. at 402.) She never reported the incident to anyone at Zurich.

### III. Ponticelli's Complaints to Fishman and Herbert

Herbert was the Senior Human Resource Manager at Zurich during the term of Ponticelli's employment there. He was designated to receive and investigate complaints of sexual harassment. In 1995 there was a sexual harassment policy in effect at Zurich. Herbert also attended a May 15, 1995, "Respectful Work Place Seminar" held in New York City for managers at Zurich. Herbert stated that the substance of the seminar related to employer sensitivity of sexual harassment in the workplace.

After the incident in which Callas blocked her in her cubicle in September 1995, Ponticelli went to Herbert's office. She informed him that the work hours and conditions at Zurich were causing her pain, that she was not eating lunch, and that she had been diagnosed with carpal tunnel syndrome. She also briefly told Herbert about the incident in her cubicle. He expressed sympathy and told Ponticelli that he knew "they" were giving her a hard time. He was surprised about the cubicle incident and spoke to Ponticelli about the atmosphere in the office. It was then that he told her to take her lunch hour.

Herbert's notes of the interview reflect that Ponticelli made the following comments: that this was a "female slave camp," and that she "was fearful of being there." Ponticelli also complained about the hostility, sexism, and the use of words like "pee pee," and that "they do not treat women like adults or humans."

Ponticelli also told Herbert about Jamison. She does not recall if she told Herbert that Jamison asked her questions of a sexual nature. In this meeting, Ponticelli asserts that Herbert asked if Jamison had ever dragged her to a motel by her hair, because she was beautiful and he would hate to think that Jamison made her sleep with him. She told Herbert that she did not have a sexual relationship with Jamison, and Herbert said that he thought there was nothing wrong with having a consensual sexual relationship with someone at work, that he did not have a happy marriage, and that he thought the office was a good place to meet people. Ponticelli spoke with Herbert for one hour. Herbert did not tell Fishman about this meeting until after Ponticelli's termination.

It was unclear to Herbert whether she was complaining about sexual harassment. He contacted Zurich's in-house counsel and they decided that Herbert would investigate to ensure that Ponticelli was paid for all of the overtime she was working and to explore further Ponticelli's statement that Jamison

had forced her to go to dinner. On October 19, 1995, Herbert again met with Ponticelli to discuss her concerns. His notes show that she said she was somewhat better and had been very tired when they last spoke. She was aware that Zurich was hiring additional staff and stated that that would make things better. She also clarified that Jamison did not physically force her to go to dinner, but that he was persistent after she had said no a few times. While Jamison had questioned her about personal things, she clarified that these questions were not sexual. Ponticelli stated to Herbert that she felt much better after their last meeting and that she knew that Herbert cared. Based on this subsequent meeting, Herbert concluded that it appeared as if Ponticelli's issues were being addressed by the hiring of an additional person, and he told her to come back to him if that did not alleviate the situation.

In December 1995, Ponticelli met with Fishman and asked to be transferred. She advised him that she was afraid of Callas. According to Fishman, she said nothing about sexual harassment. Ponticelli testified that she asked for the transfer out of Callas's department because she felt that she was given too much work for one person. In response, Fishman agreed to transfer her to Jim Gray's department, Human Resources Professional Liability, which also reported to Fishman.

Callas sent Ponticelli an e-mail wishing her well and indicating that her replacement would be starting on January 8, 1996, and that Ponticelli should train her for the first week and should act in a consultancy role after the transfer occurred. Ponticelli was also told that she would continue to be responsible for the Allstate and CARE programs, one of which already was terminated and the other of which was canceled, meaning there would be little work involved. Ponticelli, however, submits that the programs would consume all of her time. When Ponticelli went to discuss this with Callas, he inquired if she had had anal sex and whether she had ever been in a "doggy position."

Ponticelli then sent an e-mail to Callas refusing to have anything further to do with him. She stated that she would train the new technical assistant but would not act as consultant after the first week. She further declined to accept responsibility for the two programs. In response to this e-mail, Ponticelli contends that Callas pushed her into a filing cabinet. She claims she remembers that she had bruises on her body, although she is not sure what side of her body was bruised. She did not see a doctor for her injuries and did not report this incident to anyone at Zurich.

Fishman asked to speak with Ponticelli about her refusal to perform the transitional duties. Ponticelli again told Fishman of her fear of Callas and his abuse toward her. She did not tell him about any specific incidents. Fishman testified that the only complaint she lodged with him about Callas was that she was physically afraid of him.

## IV. *Ponticelli's Departure from Zurich*

On March 19, 1996, Fishman called Ponticelli to his office and told her that things were not working out. He discussed with her errors she was making in her work and showed her documents that he said contained forged signatures. Fishman testified that Joanne Roldan ("Roldan"), a Zurich employee who was licenced to serve as an insurance broker, complained to him that somebody had forged her signature to documents that required a licensed broker's signature. The forgeries were on documents associated with the business that Ponticelli was responsible for processing. Upon Fishman's statement to Ponticelli that he believed that she had forged Roldan's signature, she denied it. Ponticelli admitted that she was the only underwriting technician in the human resources professional liability group at Zurich at the time the document was processed but stated that she did not know if she had been responsible for processing the document in question. It was then that Fishman fired her.

On September 6, 1996, Ponticelli filed charges with the Equal Employment Opportunity Commission (the "EEOC") against Zurich and the individual defendants. On September 9, 1996, the EEOC issued a right to sue letter with reference to Ponticelli's Com-

plaint, and this action was filed 90 days of the issuance of the letter.

### Discussion

### I. *Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Tomka v. Seiler,* 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ. of N.Y.,* 894 F.Supp. 750, 757 (S.D.N.Y.1995) (citing *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *Burrell,* 894 F.Supp. at 758 (citing *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)).

In addition to the foregoing standards, the Second Circuit has held that additional considerations must be taken into account when deciding whether summary judgment should issue in an employment discrimination action. *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir.1994); *see also Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's documents, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue. Affidavits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination. *Gallo,* 22 F.3d at 1224.

### II. *Defendants' Motion for Summary Judgment on Ponticelli's First Cause of Action for Violation of 42 U.S.C. § 1983 Is Granted Because Ponticelli Cannot Allege State Action*

Section 1983 of Title 42 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C.A. § 1983 (West Supp.1997). The constitutional sections creating the substantive rights in this case are the Fifth and Fourteenth Amendments. Ponticelli alleges that she was denied her rights under those Amendments by Defendants on the basis of her sex. Because the Amendments are directed at the States, they can be violated only by "state action" and not by the conduct of a private actor. "Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Section § 1983's "under color of law" requirement is treated " 'as the same thing' as the 'state action' " requirement under the Constitution. *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (quoting *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966)).

To prevail in this § 1983 action, Ponticelli must show (1) that Defendants deprived her of a right secured by the Constitution or laws of the United States and (2) that, in doing so, Defendants acted under color of state law. *See Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 156–57, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). The question in this case is whether the actions of the Defendants could be considered the actions of the State for the purposes of liability under 42 U.S.C. § 1983. The answer is no.

■ "The ultimate issue in determining whether [Defendants are] subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell–Baker,* 457 U.S. at 838, 102 S.Ct. 2764 (quoting *Lugar,* 457 U.S. at 937, 102 S.Ct. 2744). For the conduct of Defendants to be fairly attributable to the State, Defendants must be state actors. *See Lugar,* 457 U.S. at 937, 102 S.Ct. 2744. In the instant case, the group of Defendants consists of a private insurance company licensed to do business in the state of New York and its employees. "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." *Harvey v. Harvey,* 949 F.2d 1127, 1130 (11th Cir.1992).

In the instant case, the Defendants may be held liable under § 1983 if they pass the so-called "close nexus/joint action test," which requires the plaintiff to demonstrate " 'a sufficiently close nexus between the State and the challenged action of the [private] regulated entity so that the action of the latter may be fairly treated as that of the State itself.'" *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).

■ Ponticelli has failed to create a sufficiently close nexus between the State and the private Defendants to mandate their classification as state actors.[1] Ponticelli has not demonstrated that the Defendants are "willful participant[s] in joint activity with the State or its agents," *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), or that they collaborated or conspired with a person acting under color of state law to violate Ponticelli's constitutional rights. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995). Zurich cannot be deemed to be acting under color of state law by virtue of the fact that it is licensed to conduct business in New York. *See, e.g., Leeds v. Meltz,* 85 F.3d 51, 54 (2d

Cir.1996) (stating that extensive regulation and even public funding, either alone or taken together, will not transform a private actor into a state actor); *Glendora v. Cablevision Sys. Corp.,* 893 F.Supp. 264, 269 (S.D.N.Y.1995) (that the defendant is subject to state and federal regulation, or operates pursuant to a government franchise, does not transform its actions into state action). Because Ponticelli fails to make a showing of state action, summary judgment is granted to Defendants.

### III. *Summary Judgment Is Granted to Defendants to the Extent That Ponticelli Alleges Disparate Treatment Due to Gender Discrimination*

The Complaint is rather cryptic in alleging the theories under which the Defendants have purportedly violated Title VII. For example, Ponticelli's opposition to Defendants' summary judgment motion clarifies that she is alleging the creation of a hostile work environment and *quid pro quo* sexual harassment. To the extent she alleges gender discrimination predicated on disparate treatment, however, her claim fails.

■ To establish a *prima facie* case of gender-based discrimination, a plaintiff must show that she was treated less favorably than comparable male employees in circumstances from which a gender-based motive could be inferred. *See Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir.1997); *Hansen v. Dean Witter Reynolds, Inc.,* 887 F.Supp. 669, 672 (S.D.N.Y.1995). The plaintiff must prove the *prima facie* case by a preponderance of evidence. *See id.* (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

■ In this case, Ponticelli's evidence of gender discrimination, apart from her sexual harassment allegations which are discussed below, consists of bare-boned assertions that the women at Zurich did all the work while the men did virtually nothing. However, the men who allegedly did nothing were the managers and underwriters, and thus not similar-

---

1. Indeed, Ponticelli provides no response to Defendant's motion for summary judgment on this cause of action.

ly situated to Ponticelli. *Cf. Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1041 (2d Cir.1993) (finding that plaintiff failed to demonstrate gender discrimination because all similarly situated employees but one were promoted faster than plaintiff).

■ Ponticelli has provided no evidence that she was singled out for the alleged abuse because she is female, and she presents no evidence that other females were abused as she claims to have been. Ponticelli's allegation that Callas yelled at her, criticized her work, and generally treated her unfairly, therefore, are insufficient to establish a *prima facie* case of gender-based discrimination. *See, e.g., Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 290 (2d Cir.1998) (stating that the court has upheld the "dismissal of a Title VII complaint for failure to state a claim where a female employee alleged gender discrimination on the basis that the promotions she sought were given to more attractive women, but did not allege that men were not also subject to attractiveness criteria in determining promotions and did not allege that she had ever been in competition with a male" (referring to *Malarkey v. Texaco, Inc.,* 704 F.2d 674, 674–75 (2d Cir.1983) (per curiam))).

■ Additionally, Ponticelli has not demonstrated that gender was the reason Fishman terminated her. In fact, at her deposition, Ponticelli admitted that Fishman did not say or do anything that could lead her to believe that he might have fired her because she is a woman.

■ Again, Ponticelli has not pointed to a single similarly situated male who, for example, was believed to have forged signatures or whose work was regarded as unsatisfactory, who received different treatment. Ponticelli claims that others made mistakes, but this bare allegation is insufficient to withstand a motion for summary judgment. *See Henry v. Daytop Village, Inc.,* 42 F.3d 89, 97 (2d Cir.1994) (finding that for a selective enforcement claim to reach a jury, the plaintiff must adduce evidence of more than mere conclusory or unsubstantiated statements). To defeat summary judgment on a claim for selective enforcement, Ponticelli must show that similarly situated male employees received favorable treatment or did not incur the same disciplinary actions for similar infractions. *See generally id.* Because Ponticelli has not "sufficiently established a pattern of disparate treatment based on gender, from which a rational factfinder could infer unlawful discriminatory animus," *id.* at 96, a claim for selective enforcement cannot be sustained.

The allegations in the Complaint, rather, are properly dealt with under the theories of sexual harassment and retaliation.

## IV. *Claims Under Title VII Against Callas, Herbert, and Fishman in Their Individual Capacities Are Dismissed*

■ In addition to naming Zurich as a defendant, Ponticelli has named Callas, Herbert, and Fishman in their individual and official capacities. The Title VII claims against each of these individuals are hereby dismissed as a matter of law.

In *Tomka,* 66 F.3d at 1314, the Second Circuit held that individual defendants, including those with supervisory capacity, could not be held personally liable for alleged violations of Title VII. The Second Circuit reasoned that Congress did not intend to allow civil liability to run against individual employees, for this would not have comported with Congress's intent to protect small employers from liability and from the burden associated with litigating discrimination. A finding of agent liability, moreover, would require courts to differentiate among agents with the power to hire and fire from supervisors without these powers. *Tomka,* 66 F.3d at 1314.

## V. *Defendants' motion for Summary Judgment Is Denied as to Ponticelli's Sexual Harassment Claim Promised on a Hostile Work Environment and Granted as to the Quid Pro Quo Claim*

■ Ponticelli alleges sexual harassment in violation of both Title VII and the HRL. Claims under the HRL are similar to sexual harassment claims under Title VII and can be examined identically for summary judgment purposes, "at least as far as determining whether sexual harassment has taken

place." *Seepersad v. D.A.O.R. Security, Inc.,* No. 97 Civ.2086, 1998 WL 474205, at *3 (S.D.N.Y. Aug.12, 1998); *see Tomka,* 66 F.3d at 1304 n. 4. However, the standards under federal and state law differ somewhat on the question of employer liability. *See Seepersad,* 1998 WL 474205, at *3. The claims will therefore be analyzed separately.

### A. *Ponticelli's Sexual Harassment Claim Under Title VII*

On June 26, 1998, a few weeks after the submission of the instant motions, the United States Supreme Court handed down decisions is *Burlington Industries, Inc. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), which have altered in some . respects the landscape of sexual harassment jurisprudence. In many cases, such a development would require further briefing by the parties, allowing them to argue the motion under the new standards. However, the submission of evidence in this case relevant to the previous standard is sufficient to enable a determination under the revised standard. Therefore further briefing is not necessary.

Application of *Ellerth* and *Faragher* to the case at bar reveal that Ponticelli has not stated a claim for *quid pro quo* harassment but that there exists a triable issue of fact as to her claim for hostile work environment under Title VII.

### 1. *Ponticelli Cannot Sustain a Claim Founded Upon the Theory of Quid Pro Quo Harassment*

■ Ponticelli contends that she was subjected to *quid pro quo* sexual harassment because she understood that she would receive a poor performance review from Callas if she would not engage in a sexual relationship with him. However, the record reflects that Ponticelli neither submitted to any alleged sexual advance nor was she denied a tangible benefit because of her rejection. Indeed, nothing in the Complaint or Ponticelli's testimony establishes that Callas conditioned any tangible job detriment or benefit on Ponticelli's refusal or acceptance of any alleged

sexual advance. In fact, Ponticelli has not demonstrated that Callas made any sexual advances or requested any sexual favors from her.

■ According to Ponticelli, she was nonetheless subjected to threats—for example, the threatened poor performance review. Yet no review was given. Ponticelli contends that while the threats were never acted upon, she continued to endure them and lived with the anticipation of their being realized. Assuming *arguendo* that Callas did make sexual advances toward Ponticelli, a threat of a tangible job detriment is insufficient to constitute *quid pro quo* sexual harassment.

In *Ellerth,* the Supreme Court confronted the question of whether a plaintiff may state a claim of *quid pro quo* sexual harassment under Title VII when the plaintiff employee has not submitted to the sexual advance of the alleged harasser and has not suffered any tangible effects on the compensation, terms, conditions, or privileges of employment as a consequence of the refusal to submit to those advances. It answered in the negative. The *Ellerth* Court stated that

> [c]ases based on threats which are carried out are referred to often as *quid pro quo* cases, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment. The terms *quid pro quo* and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether. . . .

*Ellerth,* —— U.S. at ——, 118 S.Ct. at 2264.

Indeed, as the Court observed, § 703(a) of Title VII, forbidding an employer "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's ... sex," 42 U.S.C. § 2000e–2(a)(1), does not include the terms "*quid pro quo* " and "hostile work environment." *See Ellerth,* —— U.S. at ——, 118 S.Ct. at 2264. However, when the threshold question of whether a plaintiff can prove discrimination in violation of Title VII

exists, the terms exhibit their "limited utility," *id.* because "they illustrate the distinction between those cases involving a threat which is carried out and offensive conduct in general." *Id.* at 2265.

Given that Callas did not carry out any of the alleged threats, and Ponticelli has offered no evidence indicating that Callas played a part in her termination, Ponticelli's claim must be characterized as a hostile work environment, and not a *quid pro quo*, claim. *See id.*

### 2. There Exists an Issue of Material Fact as to Whether Ponticelli Was Subjected to a Hostile Work Environment Under Title VII

In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court held that sexual harassment so "severe or pervasive" as to " 'alter the conditions of [the victim's] employment and create an abusive working environment' " violates Title VII. *Id.* at 67, 106 S.Ct. 2399 (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir.1982)). "A sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, —— U.S. at ——, 118 S.Ct. at 2283.

 To prevail on a hostile work environment claim, Ponticelli must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Tomka*, 66 F.3d at 1305 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (internal quotations omitted). To decide whether a hostile work environment exists, a finder of fact must consider the totality of the circumstances which may include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Riedinger v. D'Amicantino*, 974 F.Supp. at 327 (citing *Tomka*, 66 F.3d at 1305, n. 5). In order to

be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive. "Isolated remarks will not merit relief under Title VII." *Id.*; *see Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir.1997) (stating that "[c]onduct that is 'merely offensive' and 'not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.' " (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367)); *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir.1992) ("The incidents must be repeated and continuous...."); *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577 (2d Cir.1989) ("The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.").

 In the instant case, Defendants assumed, for the purposes of the motion, without so conceding, that a reasonable person would have experienced a sexually harassing environment under the facts alleged by Ponticelli. Had Defendants contested this point, a fuller analysis would have been outlined in the instant opinion, but the conclusion remains the same: there exists an issue of fact as to whether Ponticelli endured a hostile work environment precluding a grant of summary judgment to Defendants. Evaluating the severity and pervasiveness of a harasser's conduct on summary judgment is neither easy nor, in many cases, appropriate. *See DiLaurenzio v. Atlantic Paratrans, Inc.*, 926 F.Supp. 310, 314 (E.D.N.Y.1996) (noting that the pervasiveness of harassing conduct "is the sort of issue that is often not susceptible of summary resolution"). Here, a reasonable jury could find that the conduct of Callas, in particular, constituted sexual harassment.

The crux of Defendants' attack is that Ponticelli's sexual harassment claim fails to establish any grounds on which to impute liability to Zurich. Prior to *Ellerth* and *Faragher*, to establish a *prima facie* case of a hostile work environment, the Second Circuit required the plaintiff to show "that a specific basis exists for imputing the conduct that

created the hostile environment to the employer." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996). *Ellerth* and *Faragher,* however, have reshaped the standards for determining employer liability.

*Ellerth* and *Faragher* called for the identification of the circumstances under which an employer might be held liable under Title VII for the acts by a "supervisory employee" that created a hostile work environment constituting employment discrimination by virtue of the sexual harassment of a subordinate. *See Faragher,* —— U.S. at ——, 118 S.Ct. at 2279. The Supreme Court enunciated a rule of vicarious liability. *See id.; Ellerth,* —— U.S. at ——, 118 S.Ct. at 2270. As articulated by the Court:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed.Rule Civ.Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Id.* at 2270; *Faragher,* 118 S.Ct. at 2293.

Thus, Zurich is subject to vicarious liability for Callas's, and potentially Herbert's, conduct. However, because there is no actionable *quid pro quo* harassment—in that the harassing conduct did not culminate in a tangible job detriment for failure to succumb to the sexual advances of a supervisor—the affirmative defense looking to the reasonableness of Zurich's conduct, as well as that of Ponticelli, is available to Zurich.

■ As an initial matter, clarification is warranted as to whose behavior Ponticelli desires to impute to Zurich. The Complaint appears to assert that sexual harassment perpetrated by Callas and Herbert should

impute liability to Zurich. Ponticelli also alleges that Fishman should be liable for condoning and ratifying the harassment, and for ultimately making the decision to terminate her in March 1996. The termination is discussed below in terms of the retaliation claim. However, since Ponticelli alleges no acts by Fishman that are of a sexually harassing nature, Zurich cannot be held liable for Fishman's conduct under a theory of harassment based on the creation of a hostile work environment.

■ Ponticelli's deposition testimony also relays the inappropriate conduct of Jamison, a senior underwriter for whom Ponticelli performed work, Paul Penoni, the head of the computer department, McKuen, an underwriter, and Kiernan, a senior underwriter. Finally, Ponticelli notes a conversation she had with Herbert which she alleges was sexual in nature. Of these individuals, Callas was her "immediate" supervisor and Jamison supervised the work she conducted for him. The others, save Herbert, would be considered co-workers. Zurich would only face liability for the conduct of Ponticelli's co-workers if Ponticelli demonstrates that it " 'either provided no reasonable avenue for complaint or knew of the harassment and did nothing about it.' " *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997) (quoting *Karibian v. Columbia Univ.,* 14 F.3d 773, 780 (2d Cir.1994)); *see Van Zant,* 80 F.3d at 715. The rule in *Ellerth* and *Faragher* is limited to harassment by a supervisor with immediate or successively higher authority over the plaintiff. *See Ellerth,* —— U.S. at ——, 118 S.Ct. at 2270; *Faragher,* —— U.S. at ——, 118 S.Ct. at 2293. Not only did Ponticelli fail to include acts by these individuals in her Complaint, but the record indicates that she failed to put Zurich on notice regarding the harassing comments they made. Therefore, Ponticelli is unable to sustain a claim against Zurich for the conduct of those individuals. Thus only Callas, Jamison, and Herbert remain.

■ Herbert was neither Ponticelli's coworker nor her "immediate" supervisor. As Vice President of Human Resources, he was designated by Zurich to receive and investi-

gate claims of sexual harassment. Given his station, for the purposes of this motion, he will be subject to the analysis set forth in *Ellerth* and *Faragher*. Defendants contend, however, that the comments that Herbert made to Ponticelli do not amount to sexual harassment as a matter of law, and therefore, the issue of employer liability is moot.

Ponticelli went to Herbert to complain of Callas and Jamison's behavior. According to Ponticelli, Herbert kept wanting her to go over the details of her dinner with Jamison. Herbert asked Ponticelli if Jamison had ever dragged her to a motel by her hair. He stated that she has beautiful red hair and white skin, and would hate to think that Jamison made her sleep with him. Jamison is African American. He also told Ponticelli that he thought there was nothing wrong with having a sexual relationship with someone at work as long as it was mutually agreed upon. Moreover, he commented that she was very attractive and suggested that she should enjoy herself a little.

Defendants maintain that this alleged harassment is nothing more than an isolated incident. However, as stated above, that question is best left to a jury. The comments are not so "casual" or "isolated" to warrant dismissal as a matter of law. A jury may find they contributed to the hostile work environment created by Callas. Thus, it is appropriate to analyze Zurich's defense as to the conduct of Callas, Herbert, and Jamison to assess whether summary judgment is warranted.

The *Ellerth/Faragher* affirmative defense requires the showing of reasonable care on Zurich's part to prevent and promptly correct any sexually harassing conduct *and* a showing that Ponticelli unreasonably failed to take advantage of the opportunities provided by Zurich to prevent or correct the harassment or to otherwise avoid harm.

When litigating the first element of the defense, the Supreme Court explained that "[w]hile proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for the stated policy suitable to the employment circumstances may appropriately be addressed in any case." *Ellerth*, —— U.S. at ——, 118 S.Ct. at 2270; *Faragher*, —— U.S. at ——, 118 S.Ct. at 2293. Here, there appears to have been an antiharassment policy and an avenue for a person to complain about sexual harassment—namely, Herbert. Given Ponticelli's allegations against Herbert, whether Zurich exercised reasonable care in its designation of Herbert as the individual to receive and investigate claims of sexual harassment is a question of fact. Moreover, Ponticelli claims that her complaints of harassment were not adequately investigated and promptly corrected. Again, this illustrates a factual dispute, resolution of which is inappropriate at this stage.

Furthermore, there remain material issues of fact regarding Zurich's burden of showing that Ponticelli was unreasonable in taking steps to correct the harassment. Under this second element of the *Ellerth/Faragher* affirmative defense,

> An employer may, for example, have provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense. If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so. . . .
>
> [W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under [this] element of the defense.

*Faragher*, —— U.S. at —— – ——, 118 S.Ct. at 2292–93.

Ponticelli asserts that she complained to Herbert about Callas and Jamison. She also complained to Fishman about Callas. Yet she complained about Herbert to no one.

Regarding Callas, it is undisputed that Ponticelli requested a transfer from Fishman and stated that she felt physically threatened by Callas. Fishman responded by transferring Ponticelli so that she supported another

line of business supervised by Jim Gray. Ponticelli contends that after her transfer, in refusing to do further work for Callas, she complained again to Fishman regarding the ongoing abusive behavior to which she was subjected by Callas. She claims that she told Fishman of the sexual harassment and requested to be removed from the situation as it was dangerous for her to be there. To this, Fishman responded that he also feared Callas, that Callas had a violent temper, and that he too felt uncomfortable around him. Defendants dispute that Ponticelli described to Fishman that the nature of the harassment was sexual. Fishman represents that the only complaint Ponticelli lodged with him about Callas was that she felt physically afraid of him.

It is similarly unclear whether complaints to Herbert constituted complaints of sexual harassment. Herbert's contemporaneous notes of the conversations with Ponticelli and his deposition testimony reveal that Ponticelli's primary complaint was that she was overworked. Although Ponticelli also commented that her work environment seemed like a "female slave camp" and used phrases such as "divide me up like I am in prison camp of chauvinistic soldiers," "sexism," and "they do not treat women like adults or humans," these comments do not necessarily constitute allegations of sexual harassment.

Regarding Jamison, again there exists a factual issue whether Ponticelli's complaint to Herbert was one of sexual harassment. Ponticelli's deposition testimony reflects that she does not clearly recall if she told Herbert that Jamison asked her questions of a sexual nature. Herbert asserts that he was not sure whether Ponticelli's complaints included sexual harassment. According to Herbert, upon a subsequent meeting with Ponticelli, she claimed she felt somewhat better since their last meeting, that she was really tired when they had last met, and that Jamison's questions to her were not sexual in nature.

A jury may find that Ponticelli did or did not unreasonably fail to take advantage of the measures employed by Zurich to combat sexual harassment. Reading the facts in a light most favorable to Ponticelli, a finding that Zurich has met its burden in establish-

ing its affirmative defense cannot be made. Triable issues of fact exist as to whether Ponticelli's allegation of harassment by Callas, Jamison, and Herbert created an actionable hostile work environment, and, in the event that they did, whether Zurich can prevail on the *Ellerth/Faragher* affirmative defense. Thus, Defendants' motion for summary judgment is denied.

### B. Ponticelli's Sexual Harassment Claim Against Zurich Under the HRL

As explained below, this Court declines to exercise supplemental jurisdiction over the individual defendants in this action. The sexual harassment claim against Zurich under the HRL, however, remains.

### 1. Ponticelli's Hostile Work Environment Claim Against Zurich Under the HRL

 Claims brought under the HRL are analytically identical to claims brought under Title VII, see *Torres,* 116 F.3d at 629 n. 1, although it has been suggested that "[i]n terms of imputing liability to the employer, the [HRL] imposes a stricter standard than Title VII." *Id.* (quoting *Bush v. Raymond Corp.,* 954 F.Supp. 490, 496 n. 3 (N.D.N.Y. 1997)); *cf., Seepersad,* 1998 WL 474205, at *3.

It has been established in federal and state courts in New York that the standards of proof for claims brought under the HRL are governed by the same standards as a claim under Title VII. *See Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1177 (2d Cir.1996) (stating that "New York courts rely on federal law when determining claims under the New York Human Rights Law"). However, in the wake of *Ellerth* and *Faragher,* it is unclear whether New York courts will follow the Supreme Court's mandate or continue under the pre-*Ellerth/Faragher* standard. Because the standards for employer liability under the HRL and under Title VII pre-*Ellerth/Faragher* are virtually the same, analysis of Zurich's liability will be conducted under the previous standard. As with the claim under Title VII, Defendants' motion for

summary judgment on Ponticelli's hostile work environment claim is denied.

In *Torres*, the Second Circuit articulated the following grounds for imputing liability to employers under Title VII:

[A]n employer will be held liable for the harassment perpetrated by one of its supervisors if:

a) the supervisor was at a sufficiently high level in the company, or

b) the supervisor used his actual or apparent authority to further the harassment, or was otherwise aided in accomplishing the harassment by the existence of the agency relationship, or

c) the employer provided no reasonable avenue for complaint, or

d) the employer knew (or should have known) of the harassment but unreasonably failed to stop it.

*Torres*, 116 F.3d at 634 (footnotes omitted).

The liability of an employer under the HRL, however, differs from the *Torres* analysis in that under the HRL, "an 'employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.' " *State Div. of Human Rights v. St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687, 487 N.E.2d 268, 496 N.Y.S.2d 411, 412 (1985) (quoting *Totem Taxi v. State Human Rights Appeal Bd.*, 65 N.Y.2d 300, 305, 480 N.E.2d 1075, 491 N.Y.S.2d 293, 295 (1985)). "An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative action, indicate condonation." *Id.* at 687, 496 N.Y.S.2d 411, 487 N.E.2d 268. An employer may disprove this condonation by a showing that "the employer reasonably investigated a complaint of discriminatory conduct and took corrective action." *Father Belle Community Ctr. v. New York State Div. of Human Rights*, 221 A.D.2d 44, 53–54, 642 N.Y.S.2d 739, 746 (4th Dep't 1996). Thus, "employer liability under the [HRL] is very similar to the fourth prong of the *Torres* test, except that actual notice, rather than constructive notice, appears to be required under the [HRL]." *Seepersad*, 1998 WL 474205, at *4 (citing *St. Elizabeth's Hosp.*, 66 N.Y.2d at 687, 496 N.Y.S.2d at 412, 487

N.E.2d 268 ("Condonation ... contemplates a knowing, after-the-fact forgiveness or acceptance of an offense.")).

Ponticelli has raised an issue of fact as to the fourth prong in *Torres*. She maintains that she complained to Herbert and Fishman of the harassment and that nothing meaningful was done. Zurich points out that Ponticelli admits that she does not recall telling Herbert about Jamison's alleged sexual conduct. Similarly, while Fishman denies that she said anything about sexual conduct at all, Ponticelli does not remember anything specific about what she told Fishman about Jamison. She also concedes that she never mentioned to anyone at Zurich about the comments made to her about her clothes or body. Therefore, Zurich represents that its duty to take reasonable steps to eliminate the conduct could not have been triggered. As to Callas, the complaints again, according to Zurich, did not alert it of any sexually harassing behavior. As discussed above, there is a question of fact as to whether Herbert and Fishman were aware that Ponticelli was complaining of sexual harassment.

Assuming *arguendo* that Zurich—due to the complaints to Herbert and Fishman— had actual notice, according to Zurich, that its action in transferring Ponticelli was reasonable and sufficient is evidenced by the fact that Ponticelli does not allege any incident involving sexual harassment by Callas after her transfer. By contrast, Ponticelli contends that the transfer was illusionary because her work station remained the same, she remained in the same proximity to Callas's office, and she was directed against her will to continue to work for Callas. Also, it was after the transfer that Callas allegedly asked Ponticelli the color of her pubic hair and if she had ever had anal sex.

In support of its contention that its actions were prompt and reasonable, Zurich cites to *Perry v. Ethan Allen*, 115 F.3d 143 (2d Cir. 1997), *Van Zant*, and *Walsh v. National Westminster Bancorp., Inc.*, 921 F.Supp. 168 (S.D.N.Y.1995). Yet in *Perry*, the record showed that the plaintiff complained to management that she was being sexually harassed, and the company "took immediate responsive action by, on that very day, inves-

tigating the complaint, confronting the employees she accused, and warning them that the company would not tolerate harassment." *Perry,* 115 F.3d at 153–54. The *Van Zant* court noted that on the day the plaintiff complained an investigation began, and "within four days [the harasser] had been reprimanded and instructed in writing to limit his contract with [plaintiff]. And within ten days, [he] had been terminated." *Van Zant,* 80 F.3d at 715. Finally, in *Walsh,* the court observed that it is undisputed that the employer "promptly investigated the plaintiff's first complaint about [the harasser's] behavior and six days later took decisive action to stop the offensive behavior—[the harasser] was fired." *Walsh,* 921 F.Supp. at 173.

If Ponticelli's version of the events are accepted as true, Zurich did not as a matter of law mount the sort of prompt and reasonable response to Ponticelli's complaints as did the defendants in *Perry, Van Zant,* and *Walsh.* After all, unlike *Van Zant* and *Walsh,* the instant record fails to indicate any disciplinary action promulgated against Callas. If Zurich did have notice of the harassment, a factfinder could determine that it did not respond in a reasonable fashion. "[A]s a general proposition, whether an employer has taken prompt remedial action may present questions of fact." *Id.* This proposition holds true in this case.

### 2. *Ponticelli's Quid Pro Quo Harassment Claim Under the HRL*

■ Summary judgment for Zurich is warranted on Ponticelli's allegations of *quid pro quo* harassment under the HRL as it was under Title VII. Ponticelli's reliance on the Seventh Circuit decision in *Jansen v. Packaging Corp. of Am.,* 123 F.3d 490 (7th Cir. 1997), for the proposition that *quid pro quo* harassment encompasses clear, unfulfilled

threats that cause serious emotional harm runs afoul of the law in the Second Circuit. Moreover, this is no longer the law in the Seventh Circuit. *See Ellerth,* —— U.S. at ——, 118 S.Ct. at 2265.

As to Second Circuit authority, Ponticelli invokes *Karibian* to contend that she need not demonstrate a tangible job detriment, and that alleging that an upcoming performance review was mentioned by Callas is enough to make out her *quid pro quo* claim. However, *Karibian* involved a claim by a plaintiff who *submitted* to the sexual advances of her supervisor. *Karibian,* 14 F.3d at 778. The court reasoned that because plaintiffs who do submit to sexual advances of their supervisors will not be able to show adverse economic action, a blanket rule requiring that a plaintiff show adverse action will not be appropriate in such situations. *Id.* The Second Circuit permitted the plaintiff in *Karibian* to proceed without a showing of economic harm because she had legally suffered from being compelled to submit. *Id.* at 779.

In the present case, Ponticelli admits that she did not submit to the "sexual demands" of Callas. Thus, her *quid pro quo* claim requires the demonstration of an adverse employment action. Because an adverse review was not given and because the record is devoid of evidence that Callas played any part in Fishman's decision to terminate Ponticelli, she may not sustain a claim for *quid pro quo* sexual harassment under the HRL.

### VI. *Defendants' Motion for Summary Judgment on Ponticelli's Claim of Retaliation Is Granted*

It is unclear whether Ponticelli brings a claim of retaliation under Title VII in addition to the HRL.[2] Regardless, summary

---

**2.** Ponticelli's second cause of action describing the violation under Title VII alleges that Ponticelli "has been denied equal terms and conditions of employment and equal opportunity on the basis of her sex." (Compl.¶ 26.) The fourth cause of action asserting violation of the HRL alleges that Ponticelli was discharged or otherwise retaliated against because she opposed the unlawful employment practices of Zurich. (*See id.* ¶ 29.) The third cause of action under the HRL contends that Ponticelli was "constructive-

ly discharged" and otherwise discriminated against because of her gender. (*See id.* ¶ 27.) As discussed above, a claim of gender-based discrimination will not lie under Ponticelli's facts. Additionally, because Ponticelli unambiguously asserts that she was fired by Fishman, the concept of constructive discharge is inapplicable. Constructive discharge occurs when an employee is intentionally forced to resign because of intolerably discriminatory working conditions.

judgment is granted to Defendants.[3]

Title VII provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful practice by this subchapter. . . ." 42 U.S.C. § 2000e–3(a). As the Second Circuit has noted, "[t]he objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. College of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir.1988).

■ A *prima facie* case of retaliation under Title VII requires a showing that (1) the employee was engaged in an activity protected under Title VII, (2) the employer was aware of the plaintiff's participation in the protected activity, (3) the employee suffered adverse employment decisions, and (4) there was a causal connection between the employee's protected activity and the adverse action taken by the employer. *See Malarkey*, 983 F.2d at 1213; *Burrell*, 894 F.Supp. at 760. The requisite causal connection may be established "indirectly by showing that the protected activity was closely followed in time by the adverse action." *Manoharan*, 842 F.2d at 593 (citing *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir.1986)).

■ The plaintiff has the initial burden of proving a *prima facie* case of retaliation by a preponderance of the evidence. If the plaintiff succeeds in proving a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the plaintiff's termination. *See Hicks*, 509 U.S. at 507, 113 S.Ct. 2742; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Malarkey*, 983 F.2d at 1213. If the defendant carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for discrimination. *See*

*See Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983); *see also Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir.1993). Therefore, Count III is dismissed.

*Green*, 411 U.S. at 804, 93 S.Ct. 1817. The plaintiff may succeed in this either directly, by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The Supreme Court has held that "a reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Hicks*, 509 U.S. at 515, 113 S.Ct. 2742; *see also Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 142 (2d Cir.1993) (stating that "a Title VII plaintiff does not necessarily meet its burden of persuasion by convincing a factfinder that the employer's nondiscriminatory explanation is not creditable; rather, the trier of fact must find that the plaintiff has proven its explanation of discriminatory intent by a fair preponderance of the evidence").

■ What this means at the summary judgment stage is that "the plaintiff must establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo*, 22 F.3d at 1225. The employer may prevail by showing either that the plaintiff can raise no triable issue as to one or more of the elements of the *prima facie* case or that the plaintiff can raise no triable issue as to whether the employer's proffered reasons for its actions are a pretext for discrimination. *See Woroski v. Nashua Corp.*, 31 F.3d 105, 108–10 (2d Cir.1994).

In the instant case, Ponticelli has failed to adduce any evidence from which a factfinder could reasonably conclude that Ponticelli can establish a *prima facie* case of retaliation or

**3.** As previously mentioned, claims under the HRL are analytically identical to those under Title VII. *See, e.g., Torres*, 116 F.3d at 629 n. 1. The retaliation claims under federal and state law will therefore be discussed simultaneously.

that Zurich's articulated reasons for its actions are false or that retaliation was more likely the reason for her termination.

For the sake of this motion, it is assumed that Ponticelli's "complaints" to Herbert and Fishman constituted a protected activity. Thus the first element of the *prima facie* case has been established. As to the second element, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri–Ambrosini*, 136 F.3d at 292. The existence of a genuine issue of material fact was found above as to whether Herbert and Fishman were aware that her complaints referred to sexual harassment by Callas and Jamison.

As previously discussed, Herbert and Fishman deny such knowledge. Herbert interpreted Ponticelli's concerns as overwork in Callas's unit and unfair criticism from Callas and others about her performance under these conditions. Indeed, Herbert claims that during his second meeting with Ponticelli, she told him that things were better and that she anticipated relief when the new technical assistant hired by Callas began working. Additionally, as for Ponticelli's appeal to Fishman, as recorded in her journal and as presented in her testimony, he was unaware that sexual harassment was on her mind. Rather, Ponticelli told Fishman that she was afraid of Callas, and he accepted that. Moreover, Fishman knew nothing of the allegations regarding Herbert's conduct. While it is dubious, on the given record, that Herbert and Fishman could have reasonably understood that Ponticelli's complaints were directed at the sexually harassing environment created by Callas and Jamison, in resolving all ambiguities and inferences in favor of Ponticelli, this factor does not unequivocally favor a grant of summary judgment for Defendants.

The third element requires the showing that Ponticelli suffered an adverse employment decision. On this element, Ponticelli cross-moves for partial summary judgment, claiming that Defendants should be collaterally estopped from contending that Ponticelli

was *not* fired from her employment with Zurich. According to Ponticelli, the issue of whether she left her job voluntarily has already been fully and fairly litigated in a judicial forum, in which Defendants participated, and they should therefore be estopped from attempting to relitigate the same issue here. However, for the purposes of this motion, Defendants accept Ponticelli's assertion that she was fired. Given that summary judgment in favor of Defendants is appropriate, as Ponticelli has not demonstrated a causal connection between her complaints and her discharge, this court need not reach the issue of whether the findings of fact of the New York Unemployment Division, to which Ponticelli refers, may have collateral estoppel effect as a matter of law.

 Assuming *arguendo* that Ponticelli could show that Zurich was aware of her complaints of sexual harassment, she offers no evidence from which a reasonable jury could find that Fishman's decision to terminate her was causally connected to her prior complaints, as she must to establish her *prima facie* case of retaliation. It is undisputed from her own testimony that neither Herbert, to whom she had complained in September 1995, nor Callas, who did not know that she had complained about discrimination, had anything to do with her termination. Fishman, who granted her the transfer that she had requested, is alleged to have terminated her. After the transfer, Ponticelli claims that she complained to Fishman about Callas for a second, and presumably last, time. She asserts that he responded that he was also afraid of Callas due to his violent temper. Although unclear from the record, it appears that this conversation took place in late December 1995 or early January 1996—at least two-and-a-half months before her termination. This is hardly the close proximity of time contemplated by *Manoharan* for allowing a plaintiff to establish the "causal connection" element of retaliation claim. *See Manoharan*, 842 F.2d at 593.

 Ponticelli's only response to Defendants' assertion that she has failed in her burden to show a "causal connection" is that, prior to having been terminated, no one at Zurich complained about her quality of work.

Hence, she proclaims, the termination must have been triggered by her complaints. However, this conclusory remark cannot support the demonstration of a causal connection. Rather, it attacks Zurich's legitimate nondiscriminatory reason for her termination. Yet Ponticelli must first make out her *prima facie* case. She has failed to do so. In any event, had she established a *prima facie* case of retaliation, she further fails in raising a genuine issue of material fact as to whether reasons articulated by Zurich for her termination—primarily, numerous work errors and possible forgery— are false or that retaliation was more likely the motivation for its action.

Regarding Ponticelli's response that she received no complaints about her work, her deposition testimony and other portions of the record tell a different story. Ponticelli, herself, stated in deposition that Callas reprimanded her about inadequate work performance, about work not being completed on time, and about work not being done properly. Indeed, she admits that her job performance was suffering. Fishman's deposition stated that he received numerous complaints about Ponticelli's work product and discussed those complaints with her. For example, Jamison complained in an e-mail dated September 13, 1995, about her frequent spelling errors and failure to respond to his requests and questions; Jamison believed that Ponticelli was sabotaging her work for him. Callas also testified that the quality of her work was "not good," but that he gave her a grace period in the beginning so that she might get acclimated.

Moreover, Fishman believed that Ponticelli was responsible for forging the signature of a licensed insurance broker on documents. According to Ponticelli, on March 19, 1996, the day she was terminated, Fishman called her into his office to tell her that things were not working out. In addition to discussing the errors Ponticelli was making in her work, he showed her documented containing the forged signature of Roldan, who was licensed by New York State to serve as an insurance broker. Fishman believed that Ponticelli had committed the forgeries because Roldan said it was not her signature, it was done multiple times, and the forgeries were on documents associated with the business that Ponticelli was responsible for processing. Fishman showed Ponticelli copies of the forgeries and told her that he believed she had forged Roldan's signature. She denied the charge. Although Ponticelli did not know if she had been responsible for processing the document in question, she admitted that she was the only underwriting technician in the human resources professional liability group at Zurich during the time that the document was processed. Ponticelli has offered no credible evidence contesting Fishman's reasonable belief that she had committed forgery. Ponticelli cannot controvert Zurich's articulated reasons for termination by pronouncing them "pretextual" without supporting evidence.

Furthermore, Ponticelli's own deposition negates her allegation that the firing was due to retaliation for complaining about sexual harassment. In discussing her firing at her deposition, she stated that "on Friday, 3/15, the president of the company approached me in the kitchen and asked me about messages of mine he received. He said he was very busy and would speak to me on Monday. On Tuesday I was fired." (Ponticelli Dep. at 499–500.) These messages to which Ponticelli refers were phone calls she had received from angry brokers and forwarded to the president of Zurich. When asked whether Ponticelli believed that Fishman had retaliated against her, the following exchange ensued:

Q: Do you believe that Rob Fishman retaliated against you?

A: Yes.

Q: What did Rob Fishman ever say or do that leads you to believe that he retaliated against you?

A: I remember telling his boss—or speaking to his boss about phone calls that I was getting, and he—and I remember Rob being—acting very strangely to me after that.

Q: So based on Rob acting strangely to you after you spoke to John Amore, is that who we're referring to, his boss?

A: Yes.

Q: You believe that he retaliated against you for speaking to his boss?

A: I believe that he acted like a bully to me. That's how I felt. And I believe that that was his retaliation.

Q: What did you speak to John Amore about?

A: I don't remember.

Q: Did it have to do with broker phone calls you had received?

A: Yes.

Q: Is there anything else that Rob Fishman ever said or did that might lead you to believe that he was retaliating against you?

A: Yes.

Q: What?

A: Whenever I was late coming into the office from a doctor's appointment, he would come to my desk and say things to me, to show that he was angry that I wasn't there, and I felt that he put a lot of pressure on me that was unwarranted.

Q: And he did this, in your view, because you were late?

A: I don't know.

Q: Is there anything else that Rob Fishman ever did or said to you that might lead you to believe that he was retaliating against you?

A: No.

(Ponticelli Dep. at 720–22.)

Because Ponticelli has offered no evidence, apart from bare conclusion, linking the complaints she made with her termination—whether through a temporal connection or otherwise—and because she would not be able to establish a genuine issue of material fact as to the reasons for her termination, summary judgment is granted to Defendants on the retaliation claim. *See generally Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 251 (2d Cir.1995) (stating that plaintiff "must set forth a 'particularized allegation relating to a causal connection between the flawed outcome and gender bias' and must point to 'particular circumstances' supporting an inference of gender bias"

(quoting *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir.1994)).

## VII. *This Court Declines to Exercise Supplemental Jurisdiction Over Callas, Herbert, and Fishman*

■ The exercise of supplemental jurisdiction over nonfederal claims is governed by 28 U.S.C. § 1367. Section 1367(a) provides, in pertinent part, that:

Except as provided in subsection[ ] ... (c), in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

A nonfederal claim is part of the same constitutional "case" under Article III if it derives from the same "common nucleus of operative fact" as the federal claim. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Ponticelli's state law discrimination claims against the individual defendants is based on the same "common nucleus of operative fact" as her federal claims against Zurich, and thus this Court has power to hear the pendent state law claims.

However, § 1367(c) expressly permits a district court to decline to exercise jurisdiction over a pendent claim if: "the claim raises a novel or complex issue of State law ... or in exceptional circumstances, there are other compelling reasons for declining jurisdiction."

■ "The statutory concept of supplemental jurisdiction codified and expanded somewhat the earlier judge-made doctrines of pendent and ancillary jurisdiction. Just as with the prior law of pendent jurisdiction, the exercise of supplemental jurisdiction is left to the discretion of the district court." *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir.1994). The decision whether or not to exercise supplemental jurisdiction under § 1367(c) involves considerations of judicial economy, convenience, comity, and fairness to litigants. *See id.; see also Gibbs*, 383 U.S. at 725, 86

S.Ct. 1130; *Executive Software v.. U.S. Dist. Court,* 24 F.3d 1545, 1556–58 (9th Cir.1994). The Supreme Court has also noted that "there may be reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent claims for relief, that would justify separating state and federal claims for trial, Fed. Rule Civ.Proc. 42(b). If so, jurisdiction should ordinarily be refused." *Gibbs,* 383 U.S. at 727, 86 S.Ct. 1130.

Defendants contend that the state claims against the individual defendants should be dismissed because the application of the HRL to individuals constitutes a novel state law theory of liability, inappropriate for federal court resolution.

Two theories of individual liability have been recognized by courts under the HRL. The first rests on the definition of the word "employer" as used in the statute. The HRL provides, for example, that: "It shall be an unlawful discriminatory practice ... for an employer ... because of the ... sex ... of any individual, to ... refuse to hire or employ or to bar or discharge from employment such individual." N.Y. Exec. Law § 296(1)(a). The HRL does not define "employer," *see Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 543, 473 N.E.2d 11, 12, 483 N.Y.S.2d 659, 660 (1984) (finding that the HRL "provides no clue as to whether individual employees of a corporate employer may be sued under its provisions"), leaving courts to decide whether "employer" encompasses individuals. As stated in *McNulty v. New York City Dep't of Finance,* 941 F.Supp. 452 (S.D.N.Y.1996),

> [t]he leading interpretation has been provided by the New York Court of Appeals, which narrowed the class of individuals who could be considered liable as "employers" to exclude those "not shown to have any ownership interest or any power to do more than carry out the personnel decisions made by others."

*Id.* at 459 (quoting *Patrowich,* 63 N.Y.2d at 543, 473 N.E.2d at 12, 483 N.Y.S.2d at 660).

The second theory of individual liability derives from § 296(6), which states that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." The Second Circuit, in *Tomka,* has held that individuals may be liable for aiding and abetting discriminatory conduct prohibited by the HRL if such individuals "actively participate[ ] in the conduct giving rise to a discrimination claim." *Tomka,* 66 F.3d at 1317.

Although Ponticelli does not allege a violation of § 296(6) in her complaint—only § 296(1)(a), stated above, and 296(7), the provision against retaliation, are alleged—her papers in opposition to Defendants' motion for summary judgment premise individual liability on the "aiding and abetting" theory of § 296(6). In support, she relies on the federal line of authority enunciated in *Tomka.* However, while the Appellate Division, First Department has adopted *Tomka*'s holding that employee supervisors may be held individually liable as aiders and abetters, *see Steadman v. Sinclair,* 223 A.D.2d 392, 636 N.Y.S.2d 325, 326 (1st Dep't1996), the Court of Appeals of New York has not spoken on the matter, and the Second Department, as well as at least one lower New York Court, has disagreed with *Tomka. See Trovato v. Air Express Int'l,* 238 A.D.2d 333, 334, 655 N.Y.S.2d 656, 657 (2d Dep't1997) (rejecting *Tomka* and holding that there is no individual liability even under § 296(6) for individuals who are not "employers and employee-owners or those with specified authority"); *Foley v. Mobil Chemical Co.,* 170 Misc.2d 1, 647 N.Y.S.2d 374, 380–82 (Sup.Ct. Monroe Co.1996) (holding that § 296(6) only applies to parties outside the employment relationship who. may assist in employment discrimination).

Defendants maintain that because New York courts are at best split on this issue, this Court should decline to exercise jurisdiction over this claim. In *Houston v. Fidelity,* No. 95 Civ. 7764, 1997 WL 97838, at *10 (S.D.N.Y. Mar.6, 1997), after the defendants moved for summary judgment following the close of discovery, this Court declined to exercise supplemental jurisdiction over the individuals sued under § 296(6) of the HRL even where, as here, the claim involved a common nucleus of operative fact with the federal discrimination claim. This Court stated that "[g]iven the unsettled state of the

law, it is possible that the parties would have a 'surer-footed' reading of the extent of aiding and abetting liability in state court." *Id.* (citing *Gibbs,* 383 U.S. at 726, 86 S.Ct. 1130). Since *Houston* was decided, the split among the New York courts has increased due to the Second Department's rejection of *Tomka* in *Trovato.*

Furthermore, the presence of individual defendants who could be liable under state law for conduct that would not give rise to liability under the federal law will create practical difficulties at trial. The risk of jury confusion is considerable. *See Houston,* 1997 WL 97838, at *10. The jury will have to be instructed on the primary liability of Zurich, which will be based on the actions of Callas, Herbert, and Jamison. The jury will then have to be instructed that if they find that Zurich, through the actions of its agents, is liable under state law, they have to separately consider whether each of the individual defendants is derivatively liable for aiding and abetting Zurich in its discriminatory conduct. The Court will additionally have to determine how to instruct the jury on different remedies under the state and federal law. For example, punitive damages are available under federal law, 42 U.S.C.1981a, but not under state law. *See Thoreson v. Penthouse Int'l,* 80 N.Y.2d 490, 606 N.E.2d 1369, 591 N.Y.S.2d 978 (1992). Thus Zurich could be liable for punitive damages, but the individuals whose conduct and state of mind would be at issue in determining the appropriateness of punitive damages, would not. *See Houston,* 1997 WL 97838, at *10.

Accordingly, as the state law is unsettled and because of the potential for confusion on liability and remedies that will result from having the individual defendants in this case, the state law claims against the individual defendants Callas, Herbert, and Fishman will be dismissed without prejudice. *See id.; Torres v. New York Univ.,* No. 95 Div. 4106, 1996 WL 15691, at *2 (S.D.N.Y. Jan.17, 1996).

**VIII.** *Defendants' Motion for Summary Judgment on Ponticelli's Claim for Intentional Infliction of Emotional Distress Is Granted*

■ Under New York law, to state a claim for intentional infliction of emotional

distress ("IIED"), the plaintiff must demonstrate: (1) defendant's extreme and outrageous conduct; (2) defendant's intent to cause, or to disregard a substantial probability of causing, severe emotional distress; (3) a causal connection between defendant's conduct and the injury suffered; and (4) that plaintiff endures severe emotional distress. *See Burrell v. City Univ. of N.Y.,* 995 F.Supp. 398, 416 (S.D.N.Y.1998); *Wolff v. City of New York Fin. Servs.,* 939 F.Supp. 258, 263 (S.D.N.Y.1996).

■ The standard for extreme and outrageous conduct is extremely difficult to satisfy. *See Burrell,* 995 F.Supp. at 416; *Coraggio v. Time Inc. Magazine Co.,* No. 94 Civ. 5429, 1995 WL 242047, at *6 (S.D.N.Y. April 6, 1995). The conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 303, 448 N.E.2d 86, 90, 461 N.Y.S.2d 232, 236 (1983) (quoting Restatement [Second] of Torts § 46[1] cmt d).

Ponticelli does not contest Defendants' assertion that Zurich, Herbert, and Fishman cannot be liable for IIED. As the reasons set forth in Defendants' moving papers have merit, the IIED claim is dismissed as to those three defendants. Rather, Ponticelli focuses on the claim against Callas. She states that the consistent comments by Callas, made to debase and humiliate her, are sufficiently outrageous to submit the issue of IIED to a jury. However, Ponticelli's allegations of Callas's conduct, while more than reprehensible if true, do not meet the stringent standard required for an IIED claim.

As Defendants' point out, "New York courts are exceedingly wary of claims for [IIED] in the employment context because of their reluctance to allow plaintiffs to avoid the consequences of the employment-at-will doctrine by bringing a wrongful discharge claim under a different name." *Mariani v. Consolidated Edison Co. of N.Y., Inc.,* 982 F.Supp. 267, 275 (S.D.N.Y.1997). In the sex-

ual harassment context, it appears that for an IIED claim to survive a summary judgment motion, sexual battery should be alleged. *See Gilani v. National Ass'n of Securities Dealers, Inc.*, No. 96 Civ. 8070, 1997 WL 473383, at \*14 (S.D.N.Y. Aug.19, 1997) ("The rare instances where the New York courts have found the complaint sufficient to state an IIED claim in the employment context generally involve allegations of more significant battery, or improper physical contact." (citing *Olszewski v. Bloomberg, L.P.*, No. 96 Civ. 3393, 1997 WL 375690, at \*7 (S.D.N.Y. July 7, 1997) (permitting IIED claim because plaintiff alleged that she was raped and pressured not to reveal that fact after defendant became her supervisor))); *Gerzog v. London Fog Corp.*, 907 F.Supp. 590, 604 (E.D.N.Y.1995) ("In the rare instances where the New York courts have found the complaint sufficient to state a claim for [IIED] in the employment context, the claims have been accompanied by allegations of sex discrimination, and more significantly, battery."); *Shea v. Cornell Univ.*, 192 A.D.2d 857, 596 N.Y.S.2d 502 (3d Dep't1993) (noting that sexual harassment in the workplace is not IIED).

Here, Ponticelli has not produced evidence to sustain the claim against Callas. The only touching she alleges is the episode where Callas allegedly pushed her into a filing cabinet. This conduct, though undoubtedly unprofessional, distasteful, and improper, does not rise to the level of extreme and outrageous behavior required for an IIED claim in New York. Accordingly, summary judgment is granted in favor of Defendants' as to the IIED claim against them.

### Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is hereby granted in part and denied in part, and Ponticelli's cross-motion of partial summary judgment is hereby denied.

Specifically, summary judgment is granted to Defendants as to Ponticelli's claims alleging (1) violation of 42 U.S.C. § 1983, (2) gender-based discrimination, (3) retaliation under Title VII and the HRL, and (4) intentional infliction of emotional distress. Defendants' motion for summary judgment as to the hostile work environment claim is denied. The individual liability claim against Callas, Herbert, and Fishman under Title VII is dismissed, and the individual liability claim under the HRL is dismissed without prejudice.

It is so ordered.