Patricia WESSLING, Plaintiff,

v.

The KROGER COMPANY, Amalgamated Meat Cutters Local 539, and Joseph Waddell, Defendants.

Civ. A. No. 81–60104.

United States District Court, E.D. Michigan, S.D.

Sept. 28, 1982.

Andrew Muth, Egnor, Hamilton & Muth, Ypsilanti, Mich., for plaintiff.

Thomas L. Fleury, Keller, Thoma, Schwarze & Schwarze, Detroit, Mich., for defendant.

### FINDINGS AND MEMORANDUM

JOINER, District Judge.

FINDINGS

This is a difficult case largely because of the extraordinarily harsh punishment meted out to the plaintiff by the defendant.

Patricia Wessling is a married woman who began employment with the Kroger Company at their Livonia Meat Packing Plant on September 24, 1973. At the time of her termination on December 27, 1979, she was classified as a wrapper-packer and paid under pay rate designated as "utility". She was employed in the Pork Room at the Meat Packing Plant and like all other employees in the Pork Room, was trained to and did in fact work each of the jobs and stations in the Pork Room on a regular rotating basis.

Mr. and Mrs. Wessling have one daughter, Julie. Mrs. Wessling is a member of the Catholic faith and her husband is not. Julie is raised in the Catholic Church.

Prior to December, 1979, Mrs. Wessling had been a teacher in the CCD (Confraternity of Christian Development) program at her parish, St. Joseph's in Ypsilanti, Michigan. The CCD program is a program of catechism classes for students in elementary school. The classes meet once each week during the calendar school year. At the time of this incident they met on Saturday morning.

In October of 1979, the CCD teachers began to coordinate and make arrangements for a special Christmas Mass and play to be put on by their children. At that

time various of the teachers volunteered, according to their abilities and times to take care of certain portions of the program. She volunteered to receive the children who were to arrive at approximately 4:30 p.m. to 5:00 p.m. to get into their costumes and practice their lines for one last time in order to perform it at the 6:00 p.m. Mass. In addition, she was to set up the Church for the play and make arrangements to set up and decorate the hall adjoining the Church.

The plaintiff's participation in helping was voluntary and did not constitute an obligation of her faith. She could have rescheduled the time she was to be at the church to accommodate her work schedule. She also could have had her "helper" in the CCD program attend the rehearsal in her absence. Arrangements could have been made for another CCD instructor or her husband to fill in for her until she finished her work shift at the Meat Plant.

Plaintiff felt that it was her duty to assist her child's, and other children's education. This sense of duty was important to her and it is important to all mothers who work at developing a close relationship with their children in a moral and religious environment.

For the purpose of assuring her attendance at the Church, she spoke with her foreman, Joseph Waddell sometime before Christmas and informed him of her need to be off on this date. He told her to sign up for a personal day and she saved one of her allotted days for this purpose. She signed the appropriate book to have that day off but when the schedule was posted the week prior to Christmas she found that her name had been omitted from the list of those people granted the day off.

She was scheduled to work in the Pork Room on December 24, 1979 from 6:30 a.m. to 3:00 p.m. The Kroger Meat Plant shop rules allowed only seven employees to take a personal day on any given day and the order was determined by seniority of the employees. She did not have high enough seniority to receive a personal day for December 24, 1979. She was thirteenth in order of seniority for the nineteen people who applied for a personal day.

She again spoke with her foreman, Joseph Waddell, and asked him how she could arrange to have the day off. She spoke with both her foreman and her supervisor and requested on December 21, 1979 that she be allowed to leave early at 9:00 a.m. on December 24, 1979 in order to set up and prepare for a Christmas play that her daughter was in at her church. She wanted to leave the Meat Plant at 9:00 a.m. when she was not scheduled to be at the church until 12:00 p.m.

On December 21, 1979 Mr. Waddell told her that because of the numerous requests of employees to leave early on December 24, 1979, he could not allow any employees to leave early on December 24, 1979. He suggested that she check with Danny Walsh, Fabrication Supervisor, when she was not satisfied with this answer.

Mr. Waddell called Mr. Walsh in the presence of Mrs. Wessling and spoke with him. At that time she then spoke with Mr. Walsh and informed him that she wanted to be at the Church in the morning to help prepare for the children's Christmas presentation. He told her the schedule for that day was light and that all employees would probably be able to leave prior to the expiration of the eight hour shift. He also told her that he thought the meat order could be completed by at least 1:00 p.m. on December 24, 1979 and the entire Pork Room would be allowed to leave at that time. He also told her that he would tell Mr. Waddell to do everything he could to let her leave early as soon as the meat order was completed.

On December 24, she reported to work at 6:30 a.m.. She initiated and signed a leave-early sheet which was posted in the Pork Room office. At the time of her first break, being 8:45 a.m. she went to the lunch room, changed her clothes, punched out and left.

Due to the light production quota, all other employees in the Pork Room were released at 2:00 p.m., approximately one hour before the shift would normally have

ended. There was no disruption to the work in the Pork Room by plaintiff's absence and the Kroger Company incurred no additional costs. The employees became very upset, however, at not being permitted to go home as Mrs. Wessling had done.

Plaintiff was not given permission at any time by Mr. Waddell or Mr. Walsh to leave before the other Pork Room employees on December 24, 1979. At no time on December 24, 1979 did she receive permission from any management person to leave at 9:00 a.m. Plaintiff was specifically told by another Pork Room employee, Madeline (Bunny) Campbell that she could not leave early as Joseph Waddel told her that no one was given permission to leave early. Plaintiff chose to ignore Ms. Campbell's warning, and having been thus informed that she did not have permission to leave, walked off the job at 8:59 a.m. on December 24, 1979.

There is some evidence that at the time she left, plaintiff thought she had permission to leave the Kroger premises or that if leaving was not permitted, discipline would be a part of the progressive discipline system with a penalty substantially less than dismissal. When she returned, however, on December 27, 1979, she was informed she was suspended, which suspension was later converted to a discharge.

She was terminated from her employment for walking off the job without permission. When she left at 8:59 a.m., the Pork Room operated with less efficiency. Kroger management has to continually insure an adequate work force at the Meat Plant to make certain that the retail stores are supplied and that the meat does not perish or age. In order to maintain an adequate work force, certain rules regarding "personal days" and vacation time were established by management, and any violation of said rules resulted in a risk that an adequate work force would not be present. On December 24, 1979 the maximum number of employees allowed to take vacation days and personal days were scheduled to be off.

On December 21, 1979 Mr. Waddell was aware of numerous requests of employees to leave early on December 24, 1979 and he was concerned with whether he would have an adequate work force to complete the meat order. He could envision a possibility of mandatory overtime if there were not sufficient employees available for work on December 24, 1979. Mr. Waddell was concerned that if he allowed one person to take off early on December 24, 1979, he would have a serious morale problem with the remaining employees.

When plaintiff left early on December 24, 1979, some of the remaining employees in the Pork Room were angry and felt they would have to work longer because plaintiff left.

Although management felt that the employees in the Pork Room could probably leave at 1:00 p.m. on December 24, 1979, they were not allowed to leave until 2:00 p.m. This later time for leaving was partially a result of plaintiff's decision to leave early.

It is undisputed that if Mrs. Wessling had not reported to work at all and had not called in to tell Kroger this she would not have been terminated.

It is further undisputed that had she reported to work five hours late instead of leaving five hours early, she would not have been terminated.

As a result of her termination, Mrs. Wessling sustained a loss of $47,063.20 in wages taking into account periods of layoffs, as well as the pension contributions and other fringe benefits she was entitled to:

| | | | |
|---|---|---|---|
| 12/27/79 – 4/17/80 | at 8.44/hr. | 5,401.60 |
| 4/17/80 – 9/01/80 | at 9.24/hr. | 7,022.40 |
| 9/01/80 – 10/05/80 | at 9.64/hr. | 1,928.00 |
| 10/05/80 – 4/05/81 | at 9.84/hr. | 10,233.60 |
| 4/05/81 – 4/19/81 | at 10.24/hr. | 819.20 |
| 4/19/81 – 10/04/81 | at 10.59/hr. | 10,166.40 |
| 10/04/81 – present | at 11.05/hr. | 11,492.00 |
| | | | $47,063.20 |

In addition she sustained damages from the anguish and humiliation of the discrimination by Kroger. A fair and reasonable compensation for this is $1,000.

Plaintiff brings her claims under Title VII of the Civil Rights Act of 1964 and the

Michigan Elliott-Larsen Civil Rights Act. Title VII proscribes the Kroger Company from action as follows:

"It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individuals race, color, religion, sex or national origin; . . ."

Protected religious practices are defined as follows:

"All aspects of religious observance and practice, as well as beliefs, unless an employer demonstrates that he is unable to reasonably accommodate to an employees or prospective employees religious observance or practice without undue hardship on the conduct of the employers business." 42 U.S.C. § 2000e(j).

■ Title VII was enacted to insure equal opportunity in the market place and to protect employees from the pernicious effects of discrimination. In addition, it was designed to compensate the victims of such discrimination.

In order for plaintiff to prevail, in *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the Court determined that an employer must accommodate an employee unless it would result in more than a de minimis cost to the employer or violate a seniority agreement.

■ The elements which plaintiff must establish are well set out in *Brown v. General Motors,* 601 F.2d 956 (8th Cir.1979) as follows:

"In order to establish a prima facie case of religious discrimination under §§ 2000e–2(a)(1) and (j), a plaintiff must plead and prove that (1) he has a bona fide belief that compliance with an employment requirement is contrary to his religious faith; (2) he informed his employer about this conflict; and (3) he was discharged because of his refusal to comply with the employment requirement."

Once that prima facie case is established the burden shifts to the employer to show that they could not have accommodated employee's religious practices without "undue hardship". *Draper v. United States Pipe and Foundry Company,* 527 F.2d 515 (6th Cir.1975).

■ There is no such requirement to accommodate in Michigan Elliott-Larsen. An award under Title VII does not include an award for anguish and humiliation.

■ The plaintiff's request to appear at the church hall to set up for the church play, receive the children, and decorate, was not a religious observance protected by Title VII. It was voluntary, others could have substituted. The early attendance at the church hall was social in nature. It was far more extensive in time than necessary for religion. It was family oriented, a family obligation, not a religious obligation.

■ The plaintiff was not completely candid about her request and her testimony about it has varied. Her request on December 21, 1979 to leave early was not in terms of a request for an accommodation of her religious practices. Therefore, Kroger did not have proper notice of her request for a religious accommodation.

■ Plaintiff had a duty to do everything on her part to help to resolve the conflicts between her job duties and her alleged religious practices, and she failed in this duty when she made no attempt to reschedule the church function or find a substitute. As she did not attempt to accommodate her work schedule, Kroger did not violate Title VII when it refused permission for her to leave early.

■ To accommodate her request to leave early on December 24, 1979 resulted in more than de minimis hardship to Kroger. Other workers became angry. Kroger's relationship with these other workers suffered. No accommodation was therefore required of Kroger.

The action of Mr. Walsh advising Mrs. Wessling that they would make an effort to allow her to leave early on December 24,

1979, as soon as the meat order was completed, constituted a reasonable accommodation by Kroger, and no further accommodation was required. This accommodation would have permitted her to arrive in time to participate fully in all aspects of the religious part of the program. There is no accommodation required under Michigan Elliott-Larsen.

The penalty of discharge seems unduly harsh, however, this is not a contract action, but a civil rights action with a limited issue as to whether Kroger's action was because of failure to accommodate religious practice. But this was not a violation of any law because the discharge was not based on failure to accommodate for religious observance or practice.

In summary, the refusal to allow plaintiff to leave early was not contrary to any religion and no person could have a bona fide belief that leaving at 9:00 a.m. to do the tasks found by the court to be performed late in the afternoon would be contrary to religious belief or practice. At most it involved the natural family interest of a good parent.

There is serious question whether plaintiff candidly, openly and fully explained to Kroger the exact nature of her desires or whether she may have dissembled and been less than forthright in the request to leave.

She was discharged for walking off the job. This seems to the court to be extraordinarily harsh but that issue is not reached because the employer has not violated her rights under Michigan Elliott-Larsen or Title VII. Nor did the employer's act become a failure to accommodate under Title VII because no religious observance or practice was involved.