**Mamdouh HUSSEIN, Plaintiff,**

v.

**HOTEL EMPLOYEES AND RESTAURANT UNION, LOCAL 6, Vanessa Meade, and Peter Ward, Defendants.**

**No. 98Civ.9017(SAS).**

United States District Court,
S.D. New York.

Aug. 11, 2000.

Mamdouh Hussein, Jersey City, NJ, pro se.

Barry N. Saltzman, Herrick, Feinstein LLP, New York City, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Pro se plaintiff Mamdouh Hussein is suing the defendants for alleged violations of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.[1] The Complaint alleges that the Hotel Employees and Restaurant Union, Local 6 ("Local 6" or the "Union"), Vanessa Meade and Peter Ward retaliated against Hussein for his criticism of certain Union policies, in violation of LMRDA §§ 101(a)(1) and 609, 29 U.S.C. §§ 411(a)(1) and 529.[2] Second, the Complaint alleges that the Union violated Title VII by refusing to change its longstanding roll call procedures for per diem jobs, thereby denying Hussein an individualized religious exemption from attendance at Friday afternoon roll calls. Defendants have moved to dismiss the Complaint under Federal Rule of Civil Procedure 56(c) on the following two grounds: (1) failure to state a claim for relief; and (2) failure to exhaust internal Union remedies. For the following reasons, defendants' motion is granted and the case is dismissed.

### I. FACTS

The Union is a labor organization within the meaning of Title VII and the federal labor laws, representing workers employed at the overwhelming majority of hotels and motels in the City of New York. *See* Affi-

---

1. The Court dismissed plaintiff's claims under the First Amendment of the United States Constitution and Section 209 of the LMRDA, and for individual liability under Title VII, by an Opinion and Order dated September 27, 1999, *see Hussein v. Hotel Employees and Restaurant Union Local 6*, 98 Civ. 9017, 1999 WL 767429 (S.D.N.Y. Sept.28, 1999).

2. The alleged retaliation consists of a suspension imposed by the Union and ordered by an internal Union Trial Board, a punishment also imposed on two other Union members charged with the same offense who were not Muslims or critical of the Union.

davit of Peter Ward, Business Manager of Local 6, dated April 5, 2000 ("Ward Aff."). The membership of Local 6 reflects the diversity of the City of New York as to race, religion and national origin. *Id.* § 4. Internal Union affairs are governed in accordance with the Bylaws of Local 6 and of the New York Hotel & Motel Trades Council (the "HTC") and the Constitution of the Hotel Employees and Restaurant Employees International Union, AFL–CIO ("HEREIU"), with which Local 6 is affiliated. *Id.* ¶ 10. The terms and conditions of employment of workers represented by Local 6 are set forth primarily in the Industry–Wide Agreement ("IWA") between HTC and the Hotel Association of New York City, Inc. (the "Hotel Ass'n"), an employer bargaining group, in certain individual hotel collective bargaining agreements, and in the practices of the parties and the industry. *Id.* ¶ 6.

Peter Ward was elected Business Manager of Local 6 in 1996 and again in 1997 in an election supervised and certified to be free and fair by the United States Department of Labor. *Id.* ¶ 3. Vanessa Meade was appointed Business Agent for Local 6 in 1993 and was elected to be Vice President in 1996 and 1997. *See* Affidavit of Vanessa Meade, Vice President of Local 6, dated April 4, 2000 ("Meade Aff.").

Local 6 operates a referral hall, known as "roll call," which refers waiters to hotels on an as needed, spot-function basis. *See* Affidavit of Adela Maya, Dispatcher of Local 6, dated April 5, 2000 ("Maya Aff.") ¶ 2. Each waiter desiring roll call jobs is assigned a number maintained on a list of available waiters. *Id.* At about 3:30 p.m. on business days, Monday through Friday, the roll call waiters gather at the Union's Gertrude Lane Auditorium located at West 44th Street off of Eighth Avenue and are referred out by the dispatcher by their number in rolling order. *Id.* For example,

if there is a job requiring 10 waiters, those present with numbers 1–10 receive a ticket to the hotel for the referral; if a waiter is not present, the next number is called.[3] *Id.* The roll call resumes the next day and continues until all jobs have been announced. *Id.*

Hotels are obligated by labor agreement to accept waiters referred by the Union via roll call except where the hotel gives prior written notice that a waiter is "barred" for misconduct. *Id.* ¶ 4. Roll call jobs can pay between $200 and $300 per job and are in great demand. *Id.* Members who wrongly believe that roll call has been administered unfairly have been known to sue Local 6 in federal court or before the United States National Labor Relations Board. Ward Aff. ¶ 9. Adherence to the roll call rules is therefore necessary to insure a fair and orderly process and comply with the Union's duty of fair representation under federal labor law. *Id.*

Plaintiff, who has been employed as a roll call waiter in the hotel industry since the 1980s, is a member of the Union. *See* Affirmation of Barry N. Saltzman, attorney for defendants, in Support of Defendants' Motion for Summary Judgment, dated April 5, 2000 ("Saltzman Aff."). Plaintiff has participated in "roll call" under number 217. Maya Aff. ¶ 5. In late 1997, Hussein first claimed that attending roll call for jobs on Friday afternoons interfered with his Muslim faith. *Id.* ¶ 7. Until then, plaintiff had regularly attended roll call on Friday afternoons. *Id.*

On Friday, November 1, 1996 at about 3:30 p.m., Hussein attended roll call along with other waiters seeking job referrals. Meade Aff. ¶¶ 3–4. During roll call, a fight broke out among Hussein and two waiters of Greek national origin and Christian faith—Paris Paroussiadis and Zenon Constantine—neither of whom had ever criticized the Union. *Id.* ¶ 4. Union securi-

---

**3.** The sole exceptions to the requirement that a waiter be present to receive a referral are medical treatment and jury duty. These exceptions are short term, neutral to all members, and must be corroborated in advance by a signed written statement from a doctor or jury clerk. Maya Aff. ¶ 3.

ty and several Union officers, including Meade and Marvin Jefferson, President of Local 6, ran to the auditorium to restore order and resume the roll call. *Id.*

As a result of this incident, Meade filed a complaint and the Union commenced Trial Board disciplinary proceedings against all three waiters. *Id.* ¶ 5. The Union notified Hussein, Paroussiadis and Constantine that each would be barred from entering the Union premises, including roll call, pending hearing before the Trial Board. *Id.* Ex. C. The Union's Trial Board scheduled a hearing for January 31, 1997 and requested the appearance of Hussein, Paroussiadis and Constantine. *Id.* ¶ 6 & Ex. D. Paroussiadis and Constantine attended, but not Hussein. *Id.* The Trial Board therefore adjourned to February 7, 1997 to permit Hussein to appear. *Id.*

On February 7, 1997, Paroussiadis and Constantine again appeared and this time presented evidence and testimony to the Trial Board. *Id.* ¶ 11. Hussein, however, again chose not to attend. *Id.* ¶ 7. The Trial Board proceeded without Hussein as authorized by the Union Bylaws and the HEREIU Constitution. *Id.* The evidence at the hearing showed that at roll call on Friday, November 1, 1996, the assistant roll call dispatcher Sharron Durant informed Hussein that he had been barred by the Hotel Pennsylvania for a job that day. *Id.* ¶ 8. Hussein refused to let roll call proceed until he got his bar letter, thereby preventing all waiters behind him from getting their jobs. *Id.* A near riot then broke out with a resulting melee involving Hussein, Constantine and Paroussiadis. *Id.* ¶¶ 9–10.

Following the February 7 hearing, the Trial Board issued its decision dated March 20, 1997, finding each waiter guilty of the specified misconduct and imposing an identical penalty on each—suspension from November 1, 1996 to the effective date of the Trial Board decision, *i.e.*, time served. *Id.* ¶ 12.

In or about late August, 1997, Hussein allegedly informed the Union that because he is a Muslim he could not attend roll call on any Friday afternoon because of his religious obligations. *See* Affidavit of Mamdouh Hussein, dated May 2, 2000 ("Hussein Aff.") ¶ 18. Initially, Union officials were skeptical of Hussein's request that he receive jobs despite his absence as he had attended roll call on Fridays for over ten years. Ward Aff. ¶ 19. Nevertheless, Union officials considered the merits of Hussein's request and learned from Muslims in the Union that Friday is not an absolute "day of rest" from work in the Muslim faith. *Id.* ¶ 18. Rather, a practicing Muslim may work on Friday so long as he attends a midday service which commences as early as noon and ends no later than 2:30 p.m. *Id.* There are numerous mosques in Manhattan holding Friday services which Hussein could have attended and still be present at roll call at 3:30 p.m. *Id.* In light of the importance of fair referrals to all roll call waiters under federal labor law, Local 6 denied Hussein's request. *Id.* ¶ 19.

## II. DISCUSSION

### A. Standard for Summary Judgment

A motion for summary judgment may be granted only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e.*, whether it concerns facts that can affect the outcome under the applicable substantive law. A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir.1999) (internal quotation marks and citations omitted).

In assessing the record to determine whether genuine issues of material fact are in dispute, courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998) (citation omitted). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). However, if the moving party meets its initial burden, the non-moving party may not rely on conclusory allegations or speculation to create factual disputes. *See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998) (citations omitted), *cert. denied*, 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998). Instead, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) (internal quotation marks and citations omitted) (alteration in original).

These principles apply to cases of employment discrimination as they do other cases. The "'salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation.'" *Raskin v.*

*Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985)). However, courts must be particularly sensitive to the fact that evidence of discrimination is seldom overt. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000).

Courts must also "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.... Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances." *Id.* And while the court "has an obligation to read [the pro se party's] supporting papers liberally, and · ... interpret them to raise the strongest arguments they suggest, ..., a pro se party's bald assertion, completely unsupported by the evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F.Supp. 424, 429 (S.D.N.Y. 1995) (internal quotation marks and citations omitted) (alteration in original).

**B. Plaintiff's LMRDA Claim**

The Complaint contends that the Union violated LMRDA Sections 101(a)(1) and 609, 29 USC §§ 411(a)(1) and 529 by bringing charges against Hussein before the internal Union Trial Board, allegedly because of his criticism of Ward and the Union.[4]

---

4. The relevant LMRDA provisions state:

§ 411. (A)(1) Equal Rights.

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of speech and assembly.

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express

any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

### 1. Hussein's Failure to Exhaust Internal Union Remedies

■ The United States Supreme Court and the Second Circuit have held that a union member's failure to exhaust internal union remedies may bar his claim under the LMRDA or the Labor Management Relations Act in federal court. *See Clayton v. International Union, United Auto., Aerospace, and Agr. Implement Workers of Am.,* 451 U.S. 679, 681, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981); *Maddalone v. Local 17, United Bhd. of Carpenters and Joiners of Am.,* 152 F.3d 178, 186 (2d Cir.1998). It is uncertain whether Hussein brought charges against Ward or any other Union officer or member in order to vindicate the claims he now presents to this Court. The question, then, is whether Hussein's claims should be barred for failure to exhaust internal union remedies.

Internal Union procedures provide for full and adequate relief of plaintiff's claims. Article XI, Section 2 of the Local 6 By-Laws provides that "A member or officer of this Local shall be subject to charges and to stand trial when charged with violating these bylaws or the International Constitution." *See Ward Aff. Ex. D.* Section 3 provides for relief including "a fine, suspension, expulsion, . . . or any combination of the foregoing, or such other penalty as the determining authority may deem appropriate." *Id.* "Grounds for Charges" are listed at Article XXII, Section 1 of the HEREIU Constitution and include "(a) Violation of any specific provision of this Constitution; . . . (g) Abuse of fellow members . . . (i) Failure of an officer or member . . . to follow the rules, regulations or lawful mandates of the Local Union and the International Union; (j) Such other acts and conduct which shall be considered inconsistent with the duties and obligations of a member of a union or a violation of sound trade union principles; and (k) Preferring charges maliciously or in bad faith." Charges may be filed by "any member." *See id.* Ex. E. Thus, Hussein could have brought charges against Ward or any other Union member or officer on any of the claims *sub judice,* and obtained monetary or other relief as deemed appropriate.

■ Although plaintiff did not bring charges against Ward directly, there is evidence that he did appeal the decision of the Trial Board. *See* Hussein Aff. ¶ 22. Plaintiff stated that he appealed to the International General President, Edward T. Hanley, who affirmed the decision below. *Id.* Plaintiff then appealed Hanley's decision to the General Executive Board. *Id.* Without knowing what issues plaintiff raised on appeal, I cannot determine whether plaintiff's instant claims were addressed by the union internally. Accordingly, I decline to dismiss plaintiff's claims for failure to exhaust internal union remedies.

### 2. The Merits of Plaintiff's LMRDA Claim

■ To establish a prima facie case of retaliatory discipline in violation of the LMRDA, a plaintiff must prove that: (1) his conduct constituted "free speech" under the LMRDA; (2) that the speech was a cause for the Union taking action against him; and (3) damages. *See Black v. Ryder/P.I.E. Nationwide, Inc.,* 970 F.2d 1461, 1469 (6th Cir.1992). *Cf. Ponticelli v. Zurich Am. Ins. Group,* 16 F.Supp.2d 414, 435 (S.D.N.Y.1998) (stating that in Title VII retaliation cases, plaintiff must prove: (1) engagement in protected activity; (2) defendant's awareness of plaintiff's participation; (3) adverse treatment; and (4) a causal link between (1) and (3)).

§ 529. Prohibition on certain discipline by labor organization.

It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.

■ In considering the "causal link" element of the prima facie case, the absence of selective prosecution or dissimilar treatment defeats a claim of retaliation under the LMRDA. *Ricks v. Simons*, 759 F.Supp. 918, 924 (D.D.C.1991) ("[I]n order to make out his claim here, the Plaintiff must show that he is a victim of selective prosecution, i.e., that others who committed the same or similar violations went unpunished."). *Cf. Osier v. Broome County*, 47 F.Supp.2d 311, 326 (N.D.N.Y.1999) (similar treatment of other employees led to summary judgment in Title VII retaliation claim). Proof of similar treatment refutes any inference of a causal link necessary to sustain a retaliation claim. *Id.*

■ Here, it is uncontroverted that Hussein received exactly the same treatment as two other Union roll call waiters charged with exactly the same offense in the very same incident of which Hussein complains. Constantine and Paroussiadis were involved in the roll call disruption of November, 1996 with Hussein. Like Hussein, they were charged, were present at the Trial Board hearing (as Hussein could have been had he not abstained), were found guilty of misconduct like Hussein, and received the same discipline as Hussein. Constantine and Paroussiadis are not Muslims and have not engaged in anti-Union activity—yet they were treated exactly like Hussein. The absence of selective prosecution defeats Hussein's retaliation action and warrants summary judgment for defendants.[5]

■ Indeed, even absent proof of similar treatment, Hussein has not established the requisite causal link. The Title VII charge filed by Hussein on March 30, 1998, *see* Saltzman Aff. Ex. D, attributes the retaliation to his filing of two federal court lawsuits.[6] No reasonable jury could conclude that these actions motivated a new Union leadership to discipline Hussein close to two years after the later of these two filings. *See Ponticelli*, 16 F.Supp.2d at 436 (two-and-a-half months between protected activity and discipline "is hardly the close proximity of time" in establishing a causal link). Hussein also complains of Ward's alleged displeasure when he called the New York City Police in the Summer of 1996 and asked for their assistance in getting into the hall. *See* Complaint ¶ 12. Once again, the passage of more than two months defeats any retaliatory nexus. *Ponticelli*, 16 F.Supp.2d at 436. Furthermore, calling the police is not an activity protected by the LMRDA. Any retaliatory motive is also belied by the Complaint itself. According to the Complaint, Ward told Hussein he could "complain to whomever you want." *Id.* The Union took no action against Hussein until the altercation at roll call, and then took similar action against those members who, while engaged in the altercation, had not engaged in anti-Union conduct. Accordingly, no causal link has been shown between the Trial Board's actions and Hussein's alleged protected activities.

The Trial Board's decision finding Hussein guilty of misconduct during an undis-

---

5. Plaintiff argues that his suspension from the roll call prior to a hearing violated Section 10(b) of Article XXII of the HEREIU Constitution (the decision of the Trial Board shall by stayed until all internal appeals have been exhausted in a timely manner). *See* Affidavit of Elias J. Simadiris, a longstanding Union member, dated April 29, 2000, p. 1. While this may be true, it does not affect his retaliation claim because all three waiters were disciplined identically. If there was a violation of the HEREIU Constitution as to Hussein, there was a violation as to Paroussiadis and Constantine as well. The fact that the punishment was the same, whether constitutional or

not, refutes plaintiff's retaliation claim. Furthermore, even if there was a violation of Article XXIV, such error would most likely be deemed harmless. *See Daniels v. National Alliance of Postal and Federal Employees*, 83 Civ. 1444, 1985 WL 6408, at *12 (D.D.C. Oct. 4, 1985) (suspension before trial was harmless error where the trial committee had relief ability and considered the evidence which was more than sufficient to convict).

6. *See Hussein v. Pitta*, 88 Civ. 2549(TPG) and *Hussein v. Broomfield*, 95 Civ. 41(KMW).

puted physical disturbance at roll call on November 1, 1996 is entitled to substantial deference. *See, e.g., International Bhd. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL–CIO v. Hardeman,* 401 U.S. 233, 240, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971) (applying a "some evidence" standard to procedural adequacy of union disciplinary proceedings); *Marshall v. American Fed'n of Gov't Employees,* 996 F.Supp. 1319, 1327 (W.D.Okl. 1997); *Georgopoulos v. International Bhd. of Teamsters,* 942 F.Supp. 883, 895 (S.D.N.Y.1996), *aff'd,* 116 F.3d 1472 (2d Cir.1997). In light of the undisputed evidence of Hussein's involvement in a disruption which interrupted the Union's ability to supply jobs in an orderly fashion and the identical punishment meted out to each participant, Hussein's retaliation claim is dismissed.

### C. Plaintiff's Claim of Religious Discrimination

#### 1. Plaintiff's Prima Facie Case

■ To raise a prima facie case of religious discrimination under Title VII, a plaintiff must establish that "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 65–66, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986)(internal quotation marks and citation omitted).[7]

#### a. Hussein's Bona Fide Religious Belief

In his Title VII claim Hussein asserts that attendance at the midday prayers at mosque on Friday afternoons conflicts with the Union's neutral roll call procedure for late Friday afternoons. The evidence proffered by plaintiff fails to demonstrate a true conflict between Friday afternoon prayers and the Union's longstanding roll call procedure.

Defendants cite a document entitled "An Employer's Guide to Islamic Religious Practices" (the "Guide")—a 1997 pamphlet published and distributed by the Council on American–Islamic Relations ("CAIR"), in Washington, D.C. *See* Saltzman Aff. Ex. F. The Guide is co-sponsored by the Islamic American Conference of DePaul University. *Id.* The Guide describes the range of Muslim practices in the employment context and what accommodations, if any, are needed. Regarding Friday, the Guide explains:

*Friday Congregational Prayer*

Friday is the day for congregational worship, called *Jum'ah.* The prayer lasts a total of 45 to 90 minutes. It takes place at a mosque during the noontime prayer and includes an address or sermon.

A Muslim employee should be able to complete Friday prayers during a slightly extended lunch break . . .

Thus, according to CAIR, the Friday midday mosque service lasts 45–90 minutes. A Muslim employee can therefore fulfill his religious obligations on a slightly extended lunch break and return to work in the afternoon.

At deposition, Hussein conceded that any Muslim can pray in any mosque and

---

7. Title VII provides that:

It shall be an unlawful employment practice for a labor organization: (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin; (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to

deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex or national origin; or (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section. 42 U.S.C.2000e–2(c).

that he is aware of the existence of mosques in New York City. *See* Saltzman Aff. ¶ 13. In addition, a major New York City mosque, the Islamic Cultural Center of New York, is readily accessible from the roll call location. *Id.* ¶ 20. Hussein has never traveled from this mosque to roll call or attempted to learn how long this would take. *Id.* ¶ 18. At deposition, Hussein explained that he preferred his mosque in New Jersey where, after prayer, he visits friends' homes, raises money, and engages in other personal pursuits. *Id.* ¶ 14.

In an attempt to show a true conflict between his religious beliefs and Friday afternoon roll call, Hussein points to the Affidavit of Moustafa El–Shariki ("El–Shariki Aff."), dated April 30, 2000. In that affidavit, El–Shariki disagrees with the proposition that a Muslim can pray in any mosque, stating

> I did review that our religious day is the extended break of lunch. This misinterpretation and wrong saying is disrespectful to Islam because it is the Muslim religious day as Saturday and Sunday to other religions. It will never be expected to be extended break but is fully understood for the purpose and reason and the way we practice which all the family get together that day and should be given fairly without intimidation and you can see here why the treatment is not equal to Muslims.

> \*　　\*　　\*　　\*　　\*　　\*

> Finally I was surprised that it was stated that Muslim's [sic] can pray in any mosque; this is not true because if he is really Muslim he must understand that every community has their own mosque . . .

El–Shariki Aff. ¶¶ 4, 6. This testimony, however, does not raise a material issue of fact regarding where the *Jum'ah* prayer can take place. El–Shariki, a layperson, nowhere states that the *Jum'ah* prayer must take place in the practitioner's local mosque, he merely states that every community has its own mosque. Thus, he

does not dispute Hussein's concession that a Muslim can pray in any mosque.

■ Given that plaintiff can perform his *Jum'ah* prayer at a number of mosques within reasonable traveling distance from the location of roll call, he has not shown a bona fide religious belief that conflicts with an employment requirement. Accordingly, he has failed to establish the first requirement of a prima facie religious discrimination claim.

**b. Did Hussein Properly Inform the Union of His Religious Belief?**

■ A plaintiff seeking a religious accommodation must properly inform the defendant of his religious need as part of his prima facie case. *Ansonia Board of Ed.,* 479 U.S. at 65, 107 S.Ct. 367; *Johnson v. Angelica Uniform Group, Inc.,* 762 F.2d 671, 674 (8th Cir.1985) (no prima facie case where plaintiff gave notice in an inadequate manner). At deposition, Hussein conceded that he never provided the Union with a note ·from any Muslim cleric confirming his claimed need to be excused from roll call every Friday afternoon as his day of rest. *See* Saltzman Aff. ¶¶ 17, 19. However, in his affidavit, Hussein stated that in August of 1997, he informed the Union President, Mr. Gefrison, that he could not be present for roll call on Friday afternoons due to his religious obligations. *See* Hussein Aff. ¶ 18. Thus, there is a material issue of fact as to whether Hussein properly notified the Union of his religious beliefs. However, because Hussein has not shown a conflicting religious belief, this factual dispute is insufficient to withstand summary judgment.

**c. Hussein Did Not Suffer Discipline**

Hussein's Complaint alleges, in effect, that his religious beliefs put him in a less favored economic position than those who attend roll call on Fridays. Of course, Hussein is in no different position than any other worker who chooses to abstain from roll call for any other personal reason. In those cases, workers who do not attend

roll call do not pick up available jobs. Hussein, and all others, can pick up available jobs from roll call when they next choose to attend. *See* Maya Aff. ¶ 9. Hussein remains free to practice his religion at all times and to continue to utilize the Union sponsored roll call as his faith allows.

*Beam v. General Motors Corp.*, 78 Civ. 1130, 1979 WL 41 (N.D.Ohio Oct.11, 1979), is instructive. In *Beam*, two Saturday Sabbath observers sued General Motors Corporation ("GMC") and their union alleging violations of Title VII with respect to work opportunities. *Id.* at *1. Overtime was offered on a rotating voluntary basis but when declined, the worker was "charged" as if granted overtime and moved to the bottom of the rotation. *Id.* Plaintiffs requested that when they declined overtime opportunities which fell on their Sabbath, they either not be charged, or be assigned overtime for another day. *Id.* at *2. Rejecting plaintiffs' claims, the district court explained that plaintiffs were "unhampered in their practice of a Saturday Sabbath" and that the fact that "their beliefs put them in an economically inferior position to those employees who face no conflict with Saturday work" raised no claim under Title VII. *Id.* The court therefore granted defendants' motion for summary judgment. *Id.* at *5.

 Like the plaintiffs in *Beam*, Hussein is claiming that observance of his religious beliefs economically disadvantages him because he is skipped over for jobs on Fridays. This type of disadvantage is not discipline as contemplated by Title VII. Plaintiff was not discharged from his employment. Instead, plaintiff voluntarily chose to absent himself from Friday roll call and thereby assumed the economic consequences of that decision. Only if the Union had a duty to accommodate plaintiff's demand but refused to do so could the failure to refer jobs to plaintiff despite his absence at roll call be considered discipline. However, because the Union would incur an undue hardship in making such accommodation, *see infra,* its denial of plaintiff's request cannot be construed as discipline. *See Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) (plaintiff could not prove discipline for purposes of Title VII where the employer had no duty to accommodate plaintiff's religious practice, even when plaintiff was discharged from employment). Accordingly, plaintiff has suffered no discipline as a result of his religion and therefore fails to meet the third requirement of a prima facie case.

### 2. The Union Has No Obligation to Accommodate Hussein's Request

Nonetheless, assuming arguendo, that plaintiff has established a prima facie case, I turn to the issue of reasonable accommodation and undue hardship.[8] Title VII does not require the accommodation of personal preferences, even if wrapped in religious garb.[9] In *Hardison*, a union-represented worker at Trans World Airlines ("TWA") was required to work Saturdays in violation of his Sabbath beliefs or lose his job. 432 U.S. at 69, 97 S.Ct. 2264. TWA and Hardison asked the union to vary its seniority system to allow Hardison to switch Saturday assignments, but the union refused and Hardison was discharged. *Id.* at 68–69, 97 S.Ct. 2264. Hardison sued both TWA and his union for religious discrimination in violation of Title VII. *Id.*

---

8. Once a prima facie case is established, the defendant must produce evidence that no accommodation was possible without subjecting it to undue hardship. *See Cook v. Chrysler Corp.*, 981 F.2d 336, 339 (8th Cir.1992).

9. *See, e.g., Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682 (9th Cir.1998) (timing of religious pilgrimage was personal and required no accommodation); *Wessling v. Kroger Co. .*, 554 F.Supp. 548, 552 (E.D.Mich. 1982) (no accommodation required for employee to help set up Christmas Mass play, several hours before services, or to organize children for the play).

The Court noted that a 1972 amendment to Title VII made it an unlawful employment practice for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of its employees.[10] *Id.* at 74, 97 S.Ct. 2264. But the Court then held that the duty to accommodate does not require TWA to take steps inconsistent with an otherwise valid collective bargaining agreement. *Id.* at 79, 97 S.Ct. 2264.

> Collective bargaining, aimed at effecting workable and enforceable agreements between management and labor, lies at the core of our national labor policy, and seniority provisions are universally included in these contracts. Without a clear and express indication from Congress, we cannot agree with Hardison and the EEOC that an agreed upon seniority system must give way when necessary to accommodate religious observers.

*Id.*

Justice White explained that in allocating the burdens of weekend work, TWA and the union could either have chosen a neutral system such as seniority or rotating shifts, or it could have allocated days off in accordance with the religious needs of employees. *Id.* at 80–81, 97 S.Ct. 2264. A non-neutral basis, unlike seniority or rotation, would give a preference to employees with religious claims "at the expense of others who had strong, but perhaps nonreligious, reasons for not working on weekends." *Id.* at 81, 97 S.Ct. 2264. Rejecting such a religious preference, the Supreme Court. reasoned:

It would be anomalous to conclude that by "reasonable accommodation" Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far.

*Id.*

The Supreme Court found no violation of Title VII, stating that "TWA was not required by Title VII to carve out a special exception to its seniority system in order to help Hardison to meet his religious obligations." *Id.* at 83, 97 S.Ct. 2264. The Court held that TWA had no duty to accommodate Hardison so that "the privilege of having Saturdays off would be allocated according to religious beliefs." *Id.* at 85, 97 S.Ct. 2264. Rejecting such religious favoritism outright, the Court concluded that because "the paramount concern of Congress in enacting Title VII was the elimination of discrimination in employment," the Court would not "construe the statute to require an employer to discriminate against some employees in order to enable others to observe their Sabbath." *Id.* at 85, 97 S.Ct. 2264. *Hardison* has been followed consistently by the courts of every circuit.[11]

Most recently, the Fifth Circuit applied *Hardison* to affirm summary judgment against a plaintiff seeking a religious accommodation in work shifts. *See Weber v. Roadway Express, Inc.,* 199 F.3d 270 (5th

---

**10.** Under Title VII, an employer cannot discriminate against any employee on the basis of the employee's religious beliefs unless the employer shows that it cannot "reasonably accommodate" the employee's religious needs without "undue hardship on the conduct of the employer's business." *See* 42 U.S.C. § 2000e(j).

**11.** *See, e.g., Philbrook v. Ansonia Bd. of Educ.,* 757 F.2d 476 (2d Cir.1985), *aff'd,* 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986); *Ward v. Allegheny Ludlum Steel Corp.,* 560 F.2d 579, 580, 582 (3rd Cir.1977); *Allen v. Prince*

*George's County,* 737 F.2d 1299, 1303 (4th Cir.1984); *Weber v. Roadway Express, Inc.,* 199 F.3d 270 (5th Cir.2000); *Cummins v. Parker Seal Co.,* 561 F.2d 658, 659 (6th Cir. 1977); *Eckles v. Consol. Rail,* 94 F.3d 1041, 1048 (7th Cir.1996); *Mann v. Frank,* 7 F.3d 1365, 1368 (8th Cir.1993); *Balint v. Carson City,* 180 F.3d 1047, 1053 (9th Cir.1999); *Lee v. ABF Freight System, Inc.* 22 F.3d 1019 (10th Cir.1994); *Beadle v. Hillsborough County Sheriff's Dep't,* 29 F.3d 589, 593 (11th Cir. 1994).

Cir.2000). In that case, Weber, a Jehovah's Witness employed as a driver by Roadway Express, asserted that his religion prevented him from making long-haul overnight runs with female partners. *Id.* at 272. The Court of Appeals held that allowing Weber to skip such job runs would wrongly force Roadway to deny the run and job preferences of Weber's co-workers, who might be required to take the runs assigned to Weber. *Id.* at 273. The court held that the rationale of *Hardison* controlled even though the Roadway Express drivers had no collective bargaining agreement or other contractual right to any particular run. *Id.*

In applying *Hardison,* the *Weber* court held that the "mere possibility of an adverse impact on co-workers as a result of 'skipping over' is sufficient to constitute an undue hardship." *Id.* at 274. The Court of Appeals affirmed the district court's grant of summary judgment. *Id.* at 276.

▬▬▬ As in *Hardison* and *Weber,* Hussein asks this Court to discriminate in favor of his religious beliefs by allowing him to entirely avoid the Union's long-standing roll call rules with which every other Union member must comply. To permit such an individualized exemption would present an undue hardship for the Union. The roll call attendance rule is rooted in the Industry Wide Agreement and has been utilized consistently since 1985. *See* Ward Aff. ¶ 8.[12] The roll call procedure neutrally governs the allocation of valuable job rights for all Union members, without which charges of favoritism would fly. Ward Aff. ¶¶ 8, 18. To vary the roll call procedure and thereby permit Hussein to absent himself from Friday roll call but receive jobs nonetheless would throw this well-established institution into chaos. Such perceived favoritism would, in all likelihood, precipitate a landslide of lawsuits charging unfair preferential treatment. *See* Ward Aff. ¶ 9 ("Waiters who

wrongly believe that roll call has been administered unfairly have sued the Union in court or before the U.S. National Labor Relations Board."). An employer need not accommodate an employee's need for time off for religious observance when such accommodation would compromise the rights of co-employees. *See Cook,* 981 F.2d at 338–39.

Not only would a religious exemption for Hussein cause morale problems and trigger litigation, it would also cause an economic hardship on those waiters who attend roll call but do not get job referrals for that particular day. Assume, for example, that there are twenty waiters in all and Hussein is number twelve. Assume further that on any given Friday, all twenty waiters except Hussein attend roll call. Under Hussein's proposal, if fourteen jobs are called out, Hussein would get a job referral despite being absent and roll call would resume on Monday with waiter number fifteen. Assume then that only five jobs are called out on Monday. Given that Hussein received a job referral on Friday, these jobs would go to waiters number fifteen to nineteen. However, if Hussein was skipped over on Friday, the fourteenth job would have gone to waiter number fifteen on Friday, roll call would have resumed with waiter number sixteen on Monday, and waiter number twenty would have received a job on Monday after waiting two days. Thus, granting Hussein's accommodation and giving him a job referral despite his absence might result in another waiter spending two days at roll call without getting a referral.

This type of economic disadvantage is more than de minimis and *Hardison* teaches that Title VII cannot be used to force the Union to accept a proposal that results in such undue hardship. *See, e.g., Bhatia v. Chevron U.S.A., Inc.,* 734 F.2d 1382, 1384 (9th Cir.1984) ("An employer may prove that an employee's proposal would

---

**12.** *Cf. United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581–82, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)

("common law" of shops, *i.e.,* the practices of the industry, is a part of the collective bargaining agreement).

involve undue hardship by showing that either its impact on co-workers or its cost would be more than de minimis."). Accordingly, I find, as a matter of law, that there is no reasonable accommodation the Union could make without causing undue hardship. *See Weber,* 199 F.3d at 273 (undue hardship can exist as a matter of law); *see also Kalsi v. New York City Transit Authority,* 62 F.Supp.2d 745, 758 (E.D.N.Y.1998) ("[E]ven when the employee's proposed accommodation is relatively innocuous, such as a shift change to permit the employee to observe Sabbath, Title VII is not especially hospitable."), *aff'd,* 189 F.3d 461 (2d Cir.1999).

## III. Conclusion

For the reasons stated above, plaintiff's complaint is dismissed. The Clerk of the Court is directed to close this case.